Crandall *v.* Lincoln.

————— ‹‹•••› —————

CRANSTON C. CRANDALL AND OTHERS, RECEIVERS, *vs.* ALLEN LINCOLN AND OTHERS.

| 52 | 73 |
|----|----|
| 52 | 439 |
| 52 | 73 |
| 66 | 18 |
| 52 | 73 |
| 68 | 31 |
| 52 | 73 |
| 71 | 215 |
| 52 | 73 |
| 72 | 130 |
| 72 | 665 |

In equity the capital stock of a corporation is regarded as a trust fund for the payment of its debts, and courts will be astute to detect and defeat any device which is calculated to withdraw this fund or place it beyond the reach of creditors.

This principle is especially applicable to corporations clothed with trust powers.

A corporation may not therefore, unless in some special cases, buy in its own stock and pay for it from its capital.

As a rule to which there are few, if any, exceptions, a stockholder who conveys his stock to the corporation and receives in return a portion of its capital, holds the money so received subject to the superior equities of creditors.

Every stockholder is presumed to know the provisions of the charter of the company, and of the statutes relating to corporations, and the general principles of law governing them.

The liability of the stockholder in such a case is not dependent upon the existence of a conspiracy to defraud, or of any fraudulent intent on his part.

Where a corporation, the capital of which was impaired, was buying in its own stock through an agent, who did not disclose to the sellers the party for whom he was buying, but where the sales were in fact to the corporation, it was held that this arrangement did not protect the sellers, since they had in fact received money from the capital of the corporation, and were not only bound to make inquiry, but were chargeable with the knowledge of the agent, who became their agent for the purpose of the sale.

And especially would it not protect stockholders who were trustees of the corporation and members of its executive committee.

*A*, a stockholder, made *R*, who was the agent of the company for buying in its stock, his attorney to transfer the stock as he supposed to *L*. *L* failed to purchase, and *R* transferred it to the company and paid for it from its funds, without the actual knowledge of *A*. Held that *A* was liable to the receivers for the money paid him.

*G* was employed by the president and treasurer of the company to buy in the stock for the company. He bought certain shares of *L*, apparently for himself, and paid for them with his own money, directing *L* to go with the certificate to *R*, the company's agent, who he supposed would, as attorney, transfer the stock to the company. *R* however, to conceal the real purchaser, made the transfer to *G* and had *G* afterwards transfer it to the company, and placed the money for it to *G's* credit. Held that *L* was not liable, as he had received no money from the company, but that *G* was liable for the money received by him.

*K* was employed by the company to buy in its stock. He bought sundry shares of *W* in his own name, which were paid for by *R*, the company's agent, with funds of the company. The stock was transferred to *K*, and a few days after by him to the company. *K* at the time was a member of the company and a trustee. Held that he became in law and fact the holder of the shares and the seller of them to the company with full knowledge of the facts, and that he was chargeable and that *W* was not.

The executors of a deceased stockholder sold his stock to the company and received payment from the company. The executors afterwards resigned, and administrators *de bonis non* were appointed in their place. Held that the administrators were bound to refund from the estate the money so received.

A married woman through her husband sold her stock to the company, and received payment therefor from the company. Held that she stood upon the same footing with her husband, who had knowledge of all the facts.

The insolvent corporation had gone into the hands of receivers. Held that a suit to recover the moneys received by the stockholders from the company for stock sold to it, was properly brought by the receivers.

It was no objection to a suit in equity by the receivers for the recovery of the money, that the creditors had a remedy at law. Equity takes cognizance of all trusts, and a court of equity is the proper tribunal to enforce the rights of the beneficiaries under them.

Argued May 7th—decided September 29th, 1884.]

BILL IN EQUITY brought by the plaintiffs as receivers of the Willimantic Trust Company, a corporation, against a large number of former stockholders of the company who had sold their shares of stock to the company and been paid for the same from its capital. The suit was

brought to the Superior Court in Windham county. The
several defendants filed separate answers, and upon the
hearing the following facts were found by the court:

The Willimantic Trust Company, of Willimantic, in this
state, was incorporated by the General Assembly at its May
session, 1871. The following are the portions of its charter
important to the case :

SEC. 1 gives the company the power to hold and sell all
kinds of property, and the other usual powers of corporations.

" SEC. 2. The corporation hereby created shall also have
power to receive money in trust and on deposit, and to allow
and pay interest on said money, and to loan the same at any
rate of interest allowed by law; may take and receive
on deposit, or in custody for safe keeping, bonds, plate,
jewelry, stocks and other valuable property, upon such
terms and for such compensation as may be agreed upon by
the said corporation and the depositors respectively of any
such property aforesaid; may accept and execute all trusts,
whether fiduciary or otherwise, as shall or may be commit-
ted to said corporation by any person, persons or party, or
by the order or direction of any court or tribunal or any
other legally constituted authority in the state of Connec-
ticut, upon security, hereinafter provided, for the fulfillment
of such trusts ; and may make such special regulations in
reference to trusts, funds, deposits or savings left for accu-
mulation or safe keeping, as shall best aid the depositors or
parties interested by accumulating the same, allowing and
receiving such interest therefor, not greater than that here-
inbefore specified, as may be agreed upon.

" SEC. 3. In all cases where an application shall be made
to any court having jurisdiction for the appointment of a
guardian for an infant, or for a receiver of any estate, such
court shall have power to appoint said corporation such
receiver, or the guardian of the estate of such infant, upon
the security herein provided for the fulfillment of said trust;
and said corporation in respect to such trusts as shall be
committed to it by any court or tribunal in this state, under
any of the provisions of this act, shall be subject to such

orders and decrees as said court shall make and pass in respect thereto, and to the investment thereof, and shall be liable to account at such time and times, and in such way and manner, as said court or tribunal shall from time to time direct.

" SEC. 5. All the capital stock, property and estate of every kind belonging to said company shall be and stand charged with the fulfillment of said trusts and the payment of said deposits, and said trusts and other funds, as the first and prior lien thereon in case of the failure of said corporation ; and said company shall at all times have a lien upon the stock or property of its stockholders invested therein for all debts due from them to said company.

"SEC. 6. The capital stock of said company shall not be less than one thousand shares of one hundred dollars each, with the privilege of increasing the same, by a vote of the corporation, to any number not exceeding five thousand shares in the whole, which shall be transferable according to such rule as may be established by the trustees of said company."

Under the provisions of this act of incorporation the Willimantic Trust Company was duly organized, elected its officers, adopted by-laws, issued a prospectus, and about November 1st, 1871, began the business for which it was incorporated, and continued such business until the failure and suspension of the company on the 24th of April, 1878.

Upon petition of the bank commissioners of this state the company was enjoined from doing further business, and Cranston C. Crandall, Bela P. Learned and William H. Osborn were appointed receivers of the corporation by the Superior Court for Windham County, at its May session, 1878. Said Crandall has since died.

On the 27th of May, 1878, after proceedings had been commenced by the bank commissioners, the company lodged with the probate court for the district of Windham an assignment in insolvency, under the insolvent laws of the state. Immediately after their appointment the receivers

took possession of such of the assets of the company as were delivered to them by its officers.

Among the assets turned over to the receivers were three hundred and twenty-six shares of the capital stock of the corporation. The whole capital stock of the company was one hundred thousand dollars, divided into one thousand shares each of one hundred dollars. These three hundred and twenty-six shares were purchased by the company and transferred to the corporation at the several times, under the circumstances, and for the considerations hereinafter particularly stated in the several instances specified. The total amount paid by the company for these shares was $30,077.50.

At the time the receivers were appointed and took possession of the property of the company its assets at a fair valuation fell below its liability to depositors and creditors to the amount of $16,414.41. The receivers have acted with due diligence, care and fidelity in the discharge of their duties, and have judiciously and discreetly converted into cash the assets of the company. There is now due to depositors and other creditors, after exhausting all the assets in the hands of the receivers, (except what, if anything, may be recovered in the present suit,) the sum of $28,475$\frac{65}{100}$, exclusive of interest; with interest there is due more than $35,000, and that sum will be required by the receivers to pay the claimants their claims in full and the expenses incident to the settlement of the affairs of the corporation. The insolvency, failure and suspension of the company was caused by unfortunate investments and continued losses. Such unfortunate investments and losses commenced in 1873, and there was a continuous shrinkage in the value of the assets as compared with the liabilities, and a series of losses from that time until the corporation became hopelessly insolvent and suspended business.

At the date of January 1st, 1875, there was no surplus, and on May 1st, 1875, the capital of the company had been impaired, and the actual value of the stock on that date was about seventy-five per cent. of its par value. The

books of the company at this date, taking the assets at their face value, do not show this deficit, and the officers and managers of the company expected to realize upon such assets enough to make the stock worth par, and believed that the capital stock had not been impaired. But a vigilant scrutiny and careful investigation of the assets would have indicated to the officers and managers that the declaration and payment of the dividend in the spring of 1875 must have resulted in an impairment of the capital stock.

On January 1st, 1876, the actual value of the stock was not quite sixty per cent. of its par value, and the capital stock had been impaired about forty per cent.; on January 1st, 1877, the value of the capital stock was about forty per cent. of its par value, and on January 1st, 1878, the capital had been nearly all absorbed. In stating the value of the stock and the impairment of the capital, the stock purchased by the company from time to time has not been treated as an asset. After May 1st, 1875, there was never any period of recuperation, but a steady and continued depreciation of the value of the stock. And the dividend declared and paid in 1876 was paid out of the capital stock. Up to the fall of 1876 the officers and managers and stockholders of the company hoped and expected that the corporation would be enabled to continue its business and ultimately become a financial success; but subsequently to the 1st day of October, 1876, there existed no well-grounded or reasonable expectation of ultimate success.

Henry F. Royce was secretary and treasurer of the company from its organization to its suspension, and during all that time was a member of the executive committee. For some years prior to 1871, and from that time down to the suspension of the company, Royce was, and was generally reputed to be, doing a general stock brokerage business in Willimantic, and as such broker bought and sold shares of the company, as well as other securities. The circumstances under which the three hundred and twenty-six shares of stock were purchased by, and transferred to, the company are as follows: Some little time before the 14th

of June, 1875, as the company had in uninvested cash about $10,000, the scheme of purchasing its shares by the corporation was talked over by the officers of the company. Nothing was determined upon in relation thereto, although the idea was favorably received, until the meeting of the executive committee on that day, at which time the matter was fully talked over by the officers and the whole executive committee, and it was then determined to purchase stock of the corporation, and the president and secretary were instructed to proceed to purchase the same to the amount of $10,000. There was no vote or resolution of the executive committee to this effect, and no record thereof was kept. The purchases of stock made from time to time were reported to the trustees and to the stockholders at their annual meeting in the spring of each year, and the executive committee and board of trustees were kept advised from time to time as the purchases were made. More than the $10,000 was so spent, and it is found that there was a general understanding existing at all times on the part of the executive committee that such purchases were being made, and the president and secretary always supposed that they had full authority to make such purchases; and when these transactions were reported to the executive committee, the board of trustees and the stockholders, such action on the part of the president and secretary was approved.

The defendant Charles N. Andrews became the owner of ten shares of the stock on the 14th of May, 1873. On the 24th of March, 1875, he was in the company's place of business to make a deposit, when Royce said to him, "I understand that you desire to sell your stock, and I have a customer for you." Andrews asked who it was, and Royce said, "D. F. Lathrop, of Coventry," and Royce then inquired his price, and Andrews said, "One hundred cents on the dollar." Royce said that Lathrop would take it, and thereupon Andrews told Royce to give him credit for the amount on his account when it was received. Andrews had been, then was, and continued for some time to be, a depositor with the company, and his certificate of stock had

always been left at the company's office with Royce. Royce then asked Andrews to sign a blank transfer of the ten shares. He did so, and signed a transfer, but the name of the transferee was not filled in. Lathrop did not complete his arrangements and take the stock, and the matter lay along in this way until the 22d of June, 1875, when Royce filled in the name of the Willimantic Trust Company as transferee of the stock and carried to the credit of the account of Andrews the sum of $1,000, and charged the same to the company's account. Andrews never knew of or authorized the acts of Royce in filling in the name of the company as such transferee, except as is above stated, and paying for the stock out of the funds of the company, but at all times supposed that his stock had been sold to Lathrop, and that Lathrop had paid therefor. From the 24th of March to the 22d of June, both inclusive, Andrews was indebted to the company. He was never an officer, trustee, or member of the executive committee of the corporation.

The defendant Charles Smith on the 7th of December, 1871, became the owner of forty shares of the stock of the company, and on the 1st of November, 1872, of ten additional shares. About the middle of June, 1875, Smith, while in the company's place of business, said to Royce that he desired to sell some of his stock, and Royce told him that one E. R. Gurley would take the stock at the price named by Smith, to wit, at $95 per share. Thereupon Smith got his certificate of stock for fifty shares, and signed the blank power of attorney on the back thereof on the 17th of June, 1875, and delivered it to Royce. Royce afterwards filled the blank power of attorney by inserting therein the company as the transferee of thirty shares, and by inserting his own name as the attorney to transfer them on the books of the company. And afterwards, on June 22d, 1875, Royce, as such attorney for Smith, did transfer the thirty shares to the company, and paid Smith therefor. Smith supposed that the stock was sold to Gurley, and did not know of or authorize Royce to fill up the blank power of attorney with the name of the Willimantic Trust Company,

except as above stated. On the 30th of December, 1876, Royce, still holding the power of attorney, transferred ten more shares to the company, and carried to Smith's account as credit $900 therefor. Smith never knew until long afterwards that either lot had been transferred to the company. Smith was a trustee of the company from its organization to its failure, and had knowledge of its affairs, and knew that it was engaged in purchasing its own stock. He never saw or corresponded with Gurley in reference to these transfers, except through Royce. Gurley at some time (the date was not fixed in the proof) was employed by the officers of the company to purchase its stock for the company. The facts attending the sale and transfer of the ten shares were similar to those attending the sale and transfer of the thirty shares.

The defendant Daniel H. Eldridge is, and for many years past has been, a resident of Manchester, a farmer by occution, and not familiar with stock transactions. He purchased ten shares of the stock of this company September 2d, 1875, about two and a half years before the failure of the company, under the following circumstances: He was owner of some land in Manchester, which he had improved by building on it a small house. This land and house he sold to one Hickey for $1,500. By the terms of the sale $500 was to remain on mortgage, and Hickey was to transfer to Eldridge ten shares of the stock of the Willimantic Trust Company as the equivalent of $1,000 cash. Before agreeing to these terms Eldridge inquired of his neighbors and friends (not including any officers of the company) as to the value of the stock. He was told and believed it was a dividend paying stock of about par value. Influenced by this belief he completed his agreement with Hickey, and received the ten shares of stock as the equivalent of $1,000 cash. The land and house purchased by Hickey were worth $1,500. Eldridge took the stock not as an investment but as the equivalent of cash, which he wanted to use, and shortly began to look about for a purchaser. On the 28th of December, 1875, he went to Willimantic, expecting to meet

his friend Father DuBruycker, and sell the stock to him, in accordance with a previous talk to that effect. Father DuBruycker was absent, but a chance acquaintance to whom he told his errand advised him to go to the trust company's office, where he might find out what the stock was selling for. He went to the office, and there found Royce, who told him that a certain party had left money with him to buy the stock at $92.50 a share. Eldridge then decided to sell at that price. He surrendered his certificate and signed the paper (a blank power of attorney) which Royce told him was necessary to complete the transfer, and took his money. At the time of this sale Eldridge had no knowledge of the actual condition of the company, but believed from what he heard that the stock was worth all that he sold it for. He had no knowledge that the company or its officers were purchasing stock for the company, but sold the stock in entire good faith, believing that he was dealing with Royce as the broker of private parties, and had no reason for suspecting that he was acting in any other capacity than that which he assumed, or that he himself was not in fact selling his stock to a private person. No agreement or understanding of any kind existed between him and any other defendant stockholder or any officer or stockholder of the corporation. At the time both of the purchase and sale of the stock by Eldridge the stock had a market value of between $90 and $100 a share, and the corporation was then solvent as regards its creditors. The stock of Eldridge was, by Royce's filling in the name of the trust company as transferee, transferred directly to the company. Eldridge was an entire stranger to Royce, and signed the transfer in the presence of Royce, and made no inquiries to whom he was selling. He was paid by Royce in cash for his stock with money of the company.

The defendant James M. Reid became the owner of ten shares December 7th, 1871, and ten shares more January 17th, 1872. About the 15th of January, 1876, he talked with J. R. Arnold concerning the stock, referred in the conversation to the annual report in June, 1875, (in which report

serious losses were alluded to, and the passing of the next dividend foreshadowed), and thereupon Reid said he had held his stock long enough, and had determined to sell. Arnold expressed confidence in the bank, but said that if Reid had determined to sell he thought he could get a customer. On the 17th of January, 1876, Arnold called on Reid, and told him he had found such customer for his stock at $92.50 per share. Reid said if he could get no more he would take that. Arnold then requested Reid to sign the power of attorney on the back of the stock certificates, and Reid did so in blank, and delivered them to Arnold. Arnold delivered the certificates to Royce, who filled out the blank powers of attorney by inserting the name of the trust company as transferee, and the name of Royce as attorney to make the transfer, and credited the account of Reid with the sum of $1,850 from the funds of the company. On the 19th of January, 1876, Royce, purporting to act as the attorney of Reid, transferred the stock to the company. Reid sold the stock because he did not deem it a desirable stock to hold. He made no inquiries as to whom the stock was sold or to be transferred to. He did not believe the stock to be worth par. He did not know until after the transfer had been made to whom the sale and transfer were made. He was never an officer, or trustee of the company, or member of the executive committee. Reid was a depositor in the bank from its organization to its close, and had from $60 to $70 on deposit at the time of its failure.

The defendant Harry Boss became the owner of twenty-five shares of the stock of the trust company on the 7th of December, 1871, and of ten more shares on the 16th of October, 1872. He was a trustee from the organization of the bank until he disposed of his stock, and until the annual meeting in 1876. When he sold his stock he knew that the company had sustained losses, and did not regard his stock worth par. From 1871 to the failure of the company he was a spinner in the employ of the Willimantic Linen Company, and was unfamiliar with financial affairs. A short time prior to the 25th of January, 1876, desiring to sell his

stock, while talking with Royce about its value, he inquired as to its market value. Royce informed him that the stock had a market value of about $92.50 per share, and that he had been buying and selling at that price. A week or two after this conversation Boss arranged with Royce to take his stock at $92.50. Royce thereupon asked him to sign a blank transfer of the thirty-five shares of stock, and he did so on the 25th of January, 1876. Royce gave him a check on the company for the amount agreed upon. Boss did not enquire whom Royce was acting for, and did not know who had bought the stock. Royce afterwards filled out the blank transfer with the name of the trust company. At the time Boss sold the stock he was acting in good faith and without knowledge that it was to go to the trust company. The company was then solvent as regards depositors and creditors. Boss was a depositor with the company from its organization to the time of its failure, at which time he had on deposit there the sum of $625. He received the sum of $3,237.50 from Royce of the funds of the company.

The defendants J. T. Tracy and George S. Moulton were executors of John Tracy and were settling his estate. The estate owned thirty-five shares of the stock of the company. On the 1st of February, 1876, as such executors, they signed the power of attorney on the back of the certificate of stock. The power of attorney at the hearing appeared filled with the name of the trust company as vendee, and the name of Royce as attorney to transfer, but I am unable to find from the evidence whether the power of attorney was signed with no one named therein as vendee or not; but Moulton knew that the stock was bought for and on account of the trust company, and paid for by its funds. Moulton was president of the company from its organization until the annual meeting, June 14th, 1875, and was *ex officio* member of the executive committee, and was and continued to be a trustee of the company until 1878. He was fully acquainted with the affairs of the company, knew that it held over-due paper, that it had suffered losses and had

passed a dividend, and knew that the company was pur-
chasing its own stock. The executors were paid for the
thirty-five shares of stock by Royce with the funds of the
trust company the sum of $3,237.50, being at the rate of
$92.50 per share.

The defendant Timothy Hickey was one of the original
subscribers to the stock of the company for ten shares. He
held them until May, 1876, and then, desiring to sell, wrote
from Providence, where he then resided, to Royce to ascer-
tain if he could sell them for him. Royce replied that he
could sell them at $92.50 per share, and the bargain was there-
upon completed by Hickey saying he would take that price.
Hickey signed the blank power of attorney on his stock
certificate, and sent it to Royce, who inserted the name of
the trust company as vendee, and his own name as attorney
to transfer the same, on the 10th of May, 1876, and on the
11th of May Royce transferred as such attorney the stock
to the company. Royce paid out of the funds of the com-
pany the sum of $925 to Hickey. Hickey did not know to
whom his stock had been sold or transferred. He never
had any correspondence, conversation, agreement or under-
standing with any other respondent stockholder or any
other person regarding the sale.

The defendant E. R. Gurley had been requested by the
president, Lincoln, and the secretary and treasurer, Royce,
to purchase the stock of the trust company for them at $92\frac{1}{2}$
cents on the dollar, or better, and in compliance with this
request Gurley bought five shares of the stock of one George
Lincoln of Willimantic, in the manner hereinafter stated,
to wit:—On the 31st of May, 1876, Gurley met Lincoln
on the street in Willimantic, and Lincoln informed him that
his son, George A. Lincoln, had left five shares of the stock
with him to sell, and requested Gurley to purchase it of
him. Gurley replied that he would if at his price, and said
he would give ninety dollars a share for it. Lincoln said
he could have it for that, and Gurley on the 31st of May,
1876, gave him a check of Merritt & Co., of Springfield, for
$280, and his individual check for $170, making $450, in

payment for the same, and told Lincoln to take the stock to the trust company, give it to Royce, and the latter would know what to do with it. This transaction between Gurley and Lincoln was at an hour when the bank was closed for business, and Lincoln did not have the certificate of stock with him when Gurley paid him the money, but he was to get it, take it to the bank, and say to Royce that Gurley sent it there. Lincoln took the certificate of stock to the bank, on the back of which certificate was a power of attorney to Royce, and Royce, as attorney for Lincoln, on the 30th of May, 1876, transferred on the transfer book the stock to Gurley, and on the 31st of May, 1876, filled out another transfer on the transfer book from Gurley to the Willimantic Trust Company. Royce transferred the stock in this way so that Lincoln might not know who the real purchaser was, as he did not wish it known that the trust company had purchased it. Gurley never saw the certificate of stock, and never had it in his possession. He supposed the stock was to be transferred to Royce or to the trust company, but the certificate was filled out by Royce with the name of Gurley as vendee and Royce as his attorney. Gurley did not suppose the transfer on the book was to be made to him, but did suppose the transfer would be to Royce, or to the party purchasing the stock, and that Royce as treasurer and secretary of the company would credit him on his deposit account with the company with $450, the money he had advanced to it for the purchase of the stock, as so much additional in the bank due him. Royce at the time Lincoln left the stock there, May 31st, 1876, credited Gurley with $450 as so much deposited that day on his account. This $450 was money of the trust company. On or about June 8th, 1876, Gurley was at the bank for the first time after he had the conversation with Lincoln, and paid him the $450, and Gurley was then requested by Royce to sign the transfer on the transfer book, which was all filled out to the company. Gurley asked why, and was told by Royce that it was a mere matter of form. This was the first Gurley knew of

the transfer being to him, and then without reading it and without intending to defraud any one, and with an honest purpose, he signed the transfer on the book from himself to the bank. Gurley never had any certificate of this stock in his possession, neither did he see any. Royce understood and knew at the time of the purchase that Gurley was buying the stock at his and the president's request, for them and not for himself, and made the entries on the books (with the exception of the transfer book) of the company as stock bought of Lincoln by the company, and not as though Gurley had sold it to them. Gurley received no commission or compensation from the company, or any one, for purchasing the stock, and did not expect any. He was a depositor and made the purchase as a favor and accommodation to the corporation and its officers. Gurley acted in good faith in the matter, and advanced the money himself to pay for the stock because he understood that the officers of the company desired him to do so. He never owned the stock in fact, but was acting as an agent for the company, and signed the transfer to the corporation for the sole purpose of investing the corporation with the legal title to the stock which belonged to it, and was at that time in its possession, and its property in equity. He had been a large depositor in the bank, and at the time of its failure had on deposit there the sum of $530.52. The whole transaction on the part of Gurley was one of agency, without any knowledge or belief on his part that the company was insolvent, and without intending to do any one any wrong; and the money paid for the stock was considered by Gurley and the officers of the bank as money advanced to the company at the request of its officers; and the credit of the amount paid by Gurley to him on the books of the company was intended as a reimbursement by the company to Gurley for money so advanced. Gurley did not suppose that Royce had any reason for concealing, by a transfer to him, the fact as to who the real purchaser of the stock was.

The defendant Henry F. Royce transferred five shares of his own stock, and the defendant Martha R. Royce, his

wife, transferred her five shares, on the 3d day of March, 1877, directly to the company, and Royce took of the company's money the par value, to wit, $1,000,—$500 for himself and $500 for his wife. Royce had been secretary and treasurer from the organization of the company, knew its condition, and did not believe the stock so transferred to the company was worth par, but well knew it was worth much less than par. He was also at all times during the existence of the company a member of the executive committee.

The defendant George C. Elliott was an original subscriber for ten shares of the stock, and was a trustee of the company until he sold his stock. On or about the 26th of March, 1877, desiring to pay the Willimantic Savings Institute a debt he was owing, he asked Royce to sell it for him. Soon after this talk Royce told him that he had found a purchaser for the stock at $90 per share, and asked him to sign a transfer of the stock. Elliott did so, signing a blank transfer, with no person named as vendee. On the 26th of March, 1877, Royce gave Elliott $900 of the company's money, and afterwards filled in the name of the company as vendee. Elliott did not know who the purchaser was. He made no inquiries. He knew the condition of the company, and that the company was engaged in buying its own stock.

The defendant John G. Keigwin was asked by Royce to purchase the stock of William Reynolds for the company. Reynolds had threatened to make public the condition of the company, and to embarrass the officers of the bank, and for that reason they were desirous of getting his stock in. Keigwin consented to act as the agent of the company, and, meeting Reynolds on the street, asked him how much he would take for his stock. Reynolds replied, " One hundred cents on the dollar." Keigwin said " You can have it." Reynolds did not then have his certificate with him, and he and Keigwin went directly to the trust company's office, and after a private conversation between Keigwin and Royce, Royce said that nothing could be done without the certificate, and it was then arranged that Reynolds should bring

his certificate to Royce, and Keigwin agreed to arrange so that Reynolds could get his money of Royce. Reynolds brought his certificate, as arranged, to Royce. Royce paid him the sum of $500 of money belonging to the company, and then, at Royce's request, Reynolds, on the 9th of June, 1877, signed a transfer of the stock to Keigwin. Reynolds did not know that the $500 was money of the trust company, but supposed he had sold the stock to Keigwin, and supposed that the money received by him was Keigwin's money. A few days after the 9th of June, 1877, Keigwin was in the bank, and Royce asked him to transfer the stock to the trust company. Keigwin said he did not understand that the stock was to be transferred to him; but Royce said it was a mere matter of form, and pressed Keigwin to make the transfer, and he did so, transferring directly to the company. Keigwin neither received nor paid money for this stock, and received nothing for his services, and did not understand that he was purchasing the stock for himself, but understood and believed that he was acting as the agent of the company. He was elected a trustee in the spring of 1876, and re-elected in 1877, and knew that the company was purchasing its own stock, and was familiar with the affairs of the corporation. He acted in good faith in the matter. He never transferred or sold any other stock to the corporation.

On the 30th of June, 1877, Royce bought of Thomas Turner twenty shares and had Turner transfer them to the defendant Whiting Hayden, and then without authority or knowledge of Hayden, Royce transferred the shares to the trust company. Royce paid Turner $1,800 for the stock, out of funds of the company. Hayden had no knowledge that the transfer was made to him, or that Royce was assuming to act as his agent.

The defendant Otis Woodward was an original subscriber for twenty shares of the stock, which he held until the spring of 1877. On May 23d, 1877, having expressed dissatisfaction with the management of the bank, Royce wrote him a letter as follows:—"Dear Sir:—From the remarks

you made here yesterday I infer you are quite dissatisfied with the management of our affairs, which I assure you I regret exceedingly. Rather than have this the feeling among any of our stockholders, I should rather buy their stock. Will you please give me a price you will take for yours? Yours truly, H. F. ROYCE." Such arrangements were subsequently made that on the 30th of June, 1877, Woodward executed a blank transfer of the stock, and Royce paid him $1,800 of the company's money. Afterwards Royce filled the blank transfer with the name of the company as vendee. Woodward believed that his stock was bought by the company.

The defendant Thomas Ramsdell on the 16th of June, 1875, signed the power of attorney on the back of his certificate for ten shares in blank. In March or April, 1877, E. R. Gurley, who had been employed by the officers of the company to purchase its stock for the company, bought the stock of Ramsdell and paid him therefor. Ramsdell thereupon handed the certificate to Charles Smith, who, it was understood, was to take the place of Ramsdell on the executive committee. It was then understood and agreed (Ramsdell being a party thereto) that the stock should remain standing in Ramsdell's name until after the annual election in 1877. This course was pursued, and Ramsdell attended the annual meeting in 1877 of the stockholders, and was then elected a trustee for the year ensuing. Gurley paid Ramsdell for the stock either with his own money, which was afterwards refunded by the trust company, or with funds of the company. Ramsdell knew that the company was engaged in purchasing its own stock. Afterwards Royce filled the blank power of attorney with his own name as attorney, and with the name of the trust company as vendee, and on the 7th of August, assuming to act as the attorney of Ramsdell, transferred the stock to the company. The sum of $900 was paid for the stock. Ramsdell was a trustee from 1871 to 1877, both inclusive, and a member of the executive committee until the annual election in 1877, when he was dropped from the committee, but continued

through the year a trustee, but held no stock. Ramsdell supposed that Gurley was buying the stock for his own account.

The defendant Huber Clark bought ten shares in 1873 through Royce, was elected a trustee in 1875, 1876 and 1877, and a member of the executive committee in 1875, and knew from the beginning that the company was engaged in purchasing its own stock. In July, 1877, Clark went to Royce, talked with him about the price and sale of his stock, and asked Royce if he knew of a customer, saying he would take $90 per share, and no less. Royce said he thought Whiting Hayden would take the stock. A few days thereafter Clark was in the company's office, and asked Royce if he had heard from Hayden. Royce said, "Yes, it is all right." Clark thereupon executed a transfer of the stock in blank, on the 11th of July, 1877, and told Royce to collect the money of Hayden and credit his (Clark's) account therewith. Royce, without the knowledge or consent of Clark, filled out the blank transfer with the name of the trust company as vendee, and credited Clark's account with $900 of the company's money. Clark supposed that he was selling to Hayden, and believed the stock to be worth then $90 per share.

As to the estate of Egbert Hall. Hall applied to Royce to sell his stock. Royce reported to him that the stock was sold and paid him therefor, with money of the trust company, $455. On the 2d of August, 1877, Hall signed a transfer in blank, which was afterwards filled out by Royce to the company. Hall did not know to whom the stock was sold or transferred.

There was no fraud, combination, conspiracy, collusion, agreement or understanding by or between any of the defendants, except as herein stated.

The trust company during 1874, 1875 and 1876 declared and paid dividends as follows: May 6th, 1874, one of 5 per cent. $5,000; November 4th, 1874, one of 5 per cent. $5,000; May 5th, 1875, one of 5 per cent. $5,000; May 3d, 1876, one of 3 per cent. $3,000.

The executive committee in deciding to purchase and in directing the purchases of stock acted without any previous authority or direction from the stockholders, but the treasurer's reports, which contained a statement of the amount of the company's stock purchased up to the date of the several reports, was read at all of the stockholders' meetings, and at all the meetings of the trustees, and accepted by both such stockholders and trustees.

The members of the executive committee elected in 1874, and those elected for the years 1875, 1876 and 1877, and until the company passed into the hands of receivers, were and still are able in the aggregate to respond to any and all losses which the company sustained, or might have sustained, during the years above mentioned, by reason of any purchases of its own stock and consequent impairment or reduction of its capital stock.

During the years 1876 and 1877 the company did a large business, and considerable sums were being deposited and drawn out. The company was, in May, 1876, solvent, and if its assets had then been disposed of at their then market value, the company would have been fully able to meet and discharge all its liabilities to its creditors; but the capital stock had been impaired.

Upon these facts the case was reserved for the advice of this court.

*J. Halsey* and *J. M. Hall*, for the plaintiffs.

*A. P. Hyde*, for the defendant C. Smith.

*W. Hamersley*, for the defendant D. H. Eldridge.

*S. Lucas*, for the defendants E. R. Gurley and J. G. Keigwin.

*C. H. Briscoe* and *J. P. Andrews*, for the defendants J. M. Reid, H. Boss, and estate of J. Tracy.

*T. M. Maltbie*, for the defendants T. Ramsdell, H. F.

Royce, M. R. Royce, T. Hickey, G. C. Elliott and W. Hayden.

*E. B. Sumner*, for the defendants C. N. Andrews and O. Woodward.

*H. Clark*, for the defendants E. Hall and H. Clark.

CARPENTER, J.  The Willimantic Trust Company, a corporation by special charter, being insolvent, went into the hands of receivers in April, 1878.  The assets of the company are not sufficient to pay its liabilities, the deficit being about $35,000.  Prior to its failure the affairs of the company were managed by a board of fifteen trustees.  The by-laws required the trustees to appoint from their number an executive committee of five.  The duties of the executive committee, so far as material, are found in the fifth section of the by-laws, as follows:—" The executive committee shall superintend and direct with reference to all the business transactions of the company, especially as to the investment and disposal of its funds in stocks, bonds, mortgages and other securities, and all guardianships, receiverships and other special trusts, none of which shall in any case be accepted without their approbation, except such as shall be made by an order of a court of competent jurisdiction."

On the first of January, 1875, there was no surplus.  On the first day of May following its stock was impaired, its actual value being then about seventy-five per cent. of its par value.  The officers and managers of the institution expected to realize enough from its assets to make the stock worth par, and believed that it was worth par.  Some little time before the 14th day of June, 1875, as the company had in uninvested cash about $10,000, the scheme of purchasing the shares of the company by the corporation was talked over by the officers of the company.  Nothing was determined upon in relation thereto, although the idea was favorably received, until the meeting of the executive committee on the 14th day of June, 1875, at which time the

matter was fully talked over by the officers and the whole executive committee, and it was then determined to purchase stock of the corporation, and the president and secretary were instructed to proceed to purchase the same to the amount of $10,000. There was no vote or resolution of the executive committee to that effect, and no record thereof was kept. The purchases of stock made from time to time were reported to the trustees, and to the stockholders at their annual meeting in the spring of each year, and the executive committee and board of trustees were kept advised from time to time as the purchases were made. More than the $10,000 was so spent, and it is found that there was a general understanding existing at all times on the part of the executive committee that such purchases were being made, and the president and secretary always supposed that they had full authority to make such purchases; and when these transactions were reported to the executive committee, the board of trustees, and the stockholders, such action on the part of the president and secretary was approved. In that way three hundred and twenty-six shares of the stock of the trust company were sold and transferred to the company, for which was paid out to stockholders more than $30,000 of its funds. To enable the receivers to pay the debts they have brought this suit to recover of these stockholders the amount so received by them.

The first question presented for our consideration is, whether the purchase of stock by the corporation in the manner stated and under the circumstances was legal.

The stock of a corporation is its only basis of credit. Unlike a partnership, its members generally are not individually liable for its debts. The character, reputation and credit of its promoters do not attach to the corporation itself except to a limited extent. Hence it is of vital importance that the law should rigidly guard and protect the capital stock. Otherwise, especially in these days when so large a portion of the business of the country is carried on by corporations, confidence, on which the prosperity of the

country largely depends, would be seriously impaired. Hence it is that in equity the capital stock of a corporation is now regarded as a trust fund for the payment of debts. The creditors have a lien upon it, which is prior in point of right to any claim which the stockholders as such can have upon it; and courts will be astute to detect and defeat any scheme or devise which is calculated to withdraw this fund, or in any way to place it beyond the reach of creditors. A leading case on this subject is *Wood* v. *Dummer*, 3 Mason, 308. STORY, J., says:—"It appears to me very clear upon general principles, as well as the legislative intention, that the capital stock of banks is to be deemed a pledge or trust fund for the payment of the debts contracted by the bank. The public, as well as the legislature, have always supposed this to be a fund appropriated to such purpose. The individual stockholders are not liable for the debts of the bank in their private capacities. The charter relieves them from personal responsibility and substitutes the capital stock in its stead. Credit is universally given to this fund by the public, as the only means of payment. During the existence of the corporation it is the sole property of the corporation, and can be applied only according to its charter, that is, as a fund for payment of its debts, upon the security of which it may discount and circulate notes. Why otherwise is any capital stock required by our charters? If the stock may, the next day after it is paid in, be withdrawn by the stockholders without payment of the debts of the corporation, why is its amount so studiously provided for, and its payment by the stockholders so diligently required? To me this point appears so plain upon principles of law, as well as of common sense, that I cannot be brought into any doubt that the charters of our banks make the capital stock a trust fund for the payment of all the debts of the corporation. The bill-holders and other creditors have the first claim upon it; and the stockholders have no rights until all the other creditors are satisfied. They have the full benefit of all the profits made by the establishment, and cannot take any portion of the fund until all the other

claims upon it are extinguished. Their rights are not to the capital stock, but to the residuum after all demands upon it are paid."

These principles apply as well to this corporation as to ordinary banks issuing bills for circulation as money.

In *Nathan, Receiver*, v. *Whitlock*, 9 Paige, 152, Chancellor WALWORTH held (we quote from the marginal note,) that " a solvent stockholder who has given a stock note to a corporation for the purchase money of his stock, cannot, upon the insolvency of the company, or in contemplation of that event, even with the consent of the directors, transfer his stock to an irresponsible person, and be discharged from his liability upon substituting the note of such person for his own; such an arrangement having the effect of a withdrawal of so much of the capital of the corporation, and being a violation of the statute to prevent fraudulent bankruptcies of incorporated companies."

In *Adler* v. *Milwaukee Patent Brick Manf. Co.*, 13 Wis., 57, the court say : " The stockholders being in general free from personal responsibility, the capital stock constitutes the sole fund to which creditors look for the liquidation of their demands. It is the basis of the credit which is extended to the corporation by the public, and a substitute for the individual liability which exists in other cases. So far as creditors are concerned, it is regarded in the law as a trust fund, pledged for the payment of the debts of the corporation. Until they are paid the stockholders are postponed; they are only entitled to that which remains after the claims of the creditors are extinguished."

In *Upton, Assignee*, v. *Tribilcock*, 91 U. S. Reps., 45, the court say :—" The capital stock of a moneyed corporation is a fund for the payment of its debts. It is a trust fund, of which the directors are the trustees. It is a trust to be managed for the benefit of its shareholders during its life, and for the benefit of its creditors in the event of its dissolution. This duty is a sacred one and cannot be disregarded. Its violation will not be undertaken by any just-minded man, and will not be permitted by the courts.   *   *   *

Equally unsound is the opinion that the obligation of a subscriber to pay his subscription may be released or surrendered to him by the trustees of the company. This has been often attempted, but never successfully. The capital paid in, and promised to be paid in, is a fund which the trustees cannot squander or give away."

The same court in *Sawyer* v. *Upton, Assignee*, 91 U. S. Reps., 56, say:—" The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitute for the personal liability which subsists in private copartnerships. When debts are incurred a contract arises with the creditors that it shall not be withdrawn or applied otherwise than upon their demands, until such demands are satisfied. The creditors have a lien upon it in equity. If diverted they may follow it, as far as it can be traced, and subject it to the payment of their claims, except as against holders who have taken it *bonâ fide* for a valuable consideration and without notice." See also *Webster* v. *Upton, Assignee*, 91 U. S. Reps., 65. Many more cases might be cited to the same effect, but it is unnecessary.

These principles, which are applicable to corporations generally, are especially applicable to this by the express provisions of its charter. It had the powers of a savings bank, of a safe deposit company, and also the power to accept and execute all trusts, whether fiduciary or otherwise, committed to it by private parties, or by any court or tribunal or any other legally constituted authority in the state; and any court having jurisdiction to appoint guardians for infants or receivers of estates was authorized to appoint this corporation such receiver or guardian; and when so appointed no bonds were required, but such appointment might be made upon the security provided for in the charter, that " all the capital stock, property, and estate of every kind belonging to said company shall be and shall stand charged with the fulfilment of said trusts and the payment of said deposits and said trust and other funds, as the first and prior liens thereon in case of the failure of

said corporation." Charter, sec. 5, Special Laws, Vol. 7, p. 150.

The next section declares that the capital stock shall not be less than one thousand shares of one hundred dollars each, and carefully provides that the corporation shall not commence business "until all the capital stock is subscribed for and taken, and at least thirty thousand dollars is paid in, and the balance, if any, paid or secured to be paid, either by a first mortgage or mortgages of real estate of the value of double the amount to be secured, or by the pledge of the bonds of the United States, or of the several states, or of either of the incorporated cities, towns or boroughs of this state, of at least twenty per cent. more in value than the capital so secured."

The same year this institution was chartered the legislature placed this and other similar institutions under the supervision of the bank commissioners, and required their several presidents to make returns annually to the bank commissioners, giving a detailed statement, showing the amount invested in real estate, its location and value; the amount invested in stocks or bonds, specifying the number of shares, the par value, the cost, and the market value at the time of making return; also the number and description of bonds, their par value, cost, and present market value; and all other investments in personal property, specifying the actual cash value and cost thereof; also the amount held in trust and on deposit, &c. Session Laws of 1871, p. 597.

Besides this, the company was forbidden by law to declare any dividend except from net earnings after deducting all losses, overdrafts and obligations suspended or overdue, and from making any loan or discount on a pledge of its own stock. Gen. Statutes, p. 283, sec. 3.

It would seem as though no argument ought to be required to show that capital stock so carefully guarded both by legal principles and positive statute law cannot be divided among stockholders to the prejudice of creditors.

Arguments however are not wanting. The stock must

be paid for, or secured, not for the benefit of the stock-holders, but for the security of those dealing with the corporation. This provision was imperative; the directors were not at liberty to dispense with it. But if they were at liberty when paid, or at any time afterwards, to pay it back to the stockholders, they had the power to nullify the charter and defeat the intention of the legislature.

The statute fixing the minimum number of shares and their par value determined as far as practicable the minimum value of the capital stock, and it was clearly the intention of the legislature that it should be no less. The number of shares therefore could not be reduced, and the value of all the shares diminished, except by legislative authority. If the trustees could purchase stock with the capital of the corporation, they could of their own authority reduce the number of shares and correspondingly diminish the aggregate value of all the shares. Again, if they may purchase any of the stock, they may purchase all of it, and thus divide all the stock among the stockholders. What then becomes of the security designed for infants, estates and creditors?

The statute forbidding the company to make dividends payable from the stock and to loan money upon a pledge of its stock, by necessary implication forbids the company from purchasing its stock. The provision that the company may have a lien upon the stock as security for any debt due from the owner is not in conflict with this view of the statute. Such lien does not contemplate that the company may become the owner of the stock. It contemplates rather that the lien shall be enforced, like any other lien, by a sale of the stock, the purchaser being substituted for the delinquent stockholder.

Where it is provided by law that each stockholder in case of insolvency shall be liable to contribute a sum equal to the nominal value of his stock, there is an obvious reason why the company cannot become a stockholder. If it may, it withdraws from the fund designed to secure creditors a sum equal to the nominal value of the stock so owned.

But in this case and in other cases where stockholders are not liable to contribution, the only security which creditors have being the capital stock, it is very important that the law should guard that security with the greatest care and vigilance, and not allow trust funds belonging to creditors to be appropriated by stockholders who have no equitable right to them.

These views are abundantly sustained by the authorities from which we have quoted and from many more which might be cited. We do not intend to say that under no circumstances can a corporation legally become the owner of its own stock. Should it loan money to a stockholder and be obliged to take its own stock in payment, that would not be illegal *per se.* So too it may be allowable for a company to purchase stock temporarily with its surplus earnings; but stock should not be held indefinitely; it should be disposed of in a reasonable time. If not, and should creditors thereby be prejudiced, perhaps the managers of the company might be liable.,

Nor do we intend to say that a direct purchase would be declared illegal at the instance of a party to the transaction. If the stock is re-issued and creditors are not prejudiced probably the courts would not interfere. But as a rule to which there are few if any exceptions, when a stockholder conveys his stock to the company and receives in return a portion of the capital, he holds the money so received subject to the superior equities of creditors.

Our conclusion is that the capital stock of the company being impaired when the stock in this case was purchased, and the stock in each case having been paid for from the capital, the transactions were illegal and cannot be sustained.

In determining who of these defendants are liable several things are to be borne in mind. Every stockholder is presumed to know the provisions of the charter, the statute laws of the state, and the general principles of law governing corporations. The charter is the contract of membership. Each stockholder when he becomes a member, either

as an original subscriber to the stock or as a purchaser, is bound by the provisions of the charter and the general law governing corporations. The law therefore conclusively presumes that he undertakes to perform all the duties and assumes all the liabilities thereby imposed upon him. Those duties and liabilities cannot be changed at the pleasure of the members nor avoided for their convenience.

The case does not turn on a question of conspiracy, or actual or intended fraud. The plaintiffs alleged conspiracy and actual fraud, but the court has found the allegations untrue. That finding, however, is not decisive of the case. If the defendants have in their hands funds to which the creditors have a higher and better right, the law will not allow them to retain them, irrespective of a conspiracy and actual fraud, and whatever may have been their motives in obtaining them. That they have such funds is too clear for question.

Equity will follow and reclaim trust property so far as it can be traced and identified; and when it is money it will compel the party receiving it with knowledge of the trust to restore it.

Each transaction between the corporation and the several defendants was simply a purchase of stock. There is no room for the claim that it came into the company's hands incidentally and in the regular course of business. It was a direct purchase for cash. Apparently there was no intention to re-issue it, and no expectation that it ever could be re-issued.

Many of these defendants were trustees, and some of them were members of the executive committee. All such knew that the capital of the company was impaired, and that some one was engaged in buying the stock for the corporation, and paying for it out of the capital. They will not be permitted to avail themselves of their ignorance of the purchaser. They were bound to know, and they had the means of knowing. They could have known, had they desired, whether they were selling to the company or to others; whether the purchaser was legally capable of taking

and holding it; and whether the money they were receiving was burdened with a trust or free from any trust. They were responsible for the safe keeping and proper disposition of these trust funds. They could not permit their treasurer to pay them out to themselves and justify the act and retain the funds on the ground that they did not know that they were receiving trust funds. It was their business to know, and it was a gross breach of trust not to know.

Besides, they severally employed Royce, their treasurer, as a broker to sell their stock. He actually sold it to the company and paid for it with its capital. That looks very much like a mere cover; but independently of that, each one individually made Royce his agent in the strictest sense. So far as any negotiations were required Royce made them for and in behalf of the seller. There is no pretense that the trustees or the executive committee ever acted in behalf of the corporation, the purchaser, except as there was a silent understanding, without vote or record, that the treasurer was to purchase stock. The case then seems to be this:—Royce, as broker, contracted with Royce, as treasurer and agent of the corporation, and thereby the corporation formally became the owner of the stock of these trustees. It is worse than idle to ask this court to sanction and hold valid such a transaction.

Nothing more need be said as to the liability of those who were officers of the company. The liability of John G. Keigwin, one of the trustees, in respect to the stock of William Reynolds, will be hereafter specially considered.

It seems that the business of transferring the stock of Mrs. Royce to the company and receiving the pay therefor was in the hands of her husband. She therefore must stand upon the same footing with him.

As to John Tracy's estate. After Tracy's death his executors, with knowledge of all the circumstances, sold the stock to the company. The amount paid therefor, being a portion of the capital, went into the estate. The executors have no more right to retain it than an individual would have under the same circumstances. The fact that they are

no longer executors, and that the estate has passed into the hands of administrators *de bonis non*, does not affect the case. The administrators must refund from the estate the money so received to the receivers.

The cases of C. N. Andrews, James M. Reid, Timothy Hickey, Otis Woodward, and the estate of Egbert Hall, are substantially alike. Andrews made Royce his attorney to transfer the stock as he supposed to D. F. Lathrop. Lathrop failed to purchase it, and thereupon Royce transferred it to the company and paid for it from its funds. This was without the actual knowledge of Andrews.

Reid negotiated with J. R. Arnold, not knowing the purchaser. At Arnold's request he made Royce his attorney to tranfer it, and he transferred it to the company. Hickey and Hall sold through Royce, not knowing the purchaser. Woodward believed that his stock was bought by the trust company.

It is doubtless true that all these parties believed that they had a perfect right to sell to the trust company; but that belief does not make it so. Legal principles cannot rest upon the belief or ignorance of those who are affected by them. Therefore these parties must be treated for all practical purposes as though they knew the law and knew that they could not legally sell their stock to the company. Otherwise the principle itself is of no value, as it might easily be evaded in all cases. Hence any suggestion of hardship to them in consequence of being misled, or deprived of an opportunity to sell to other parties, cannot be considered. It was for the seller to know, and he might have known in each case, who the purchaser was. His ignorance of a matter which he had the means of knowing and which he was bound to know, cannot divest the money in his hands of its trust quality. Besides, so far as these parties, or any of them, sold through Royce as a broker or agent, his knowledge is to be imputed to them, and they are justly chargeable with knowledge on that ground.

The company commenced the purchase of stock in June, 1875. In September following Daniel H. Eldridge, knowing

nothing of the circumstances, took ten shares of the stock in exchange for other property, intending as soon as might be to convert it into money. In December he went to Willimantic with a view to selling it to a friend, but not finding him at home some one directed him to Royce, who represented to him that a certain party had left money with him with which to purchase stock. He sold it to Royce, not knowing that it was to be transferred to the company. Eldridge sold without fraud and in good faith.

At first sight it seems harsh to hold that it was not a valid sale. But if the view we have taken of the character and nature of this stock is sound, and we have no doubt that it is, the conclusion inevitably follows that under no circumstances can a stockholder sell his stock to the company and take therefor his portion of the capital stock to the prejudice of creditors. The illegality of the transaction does not at all depend upon the actual knowledge or *mala fides* of the seller; if he in fact sells to the company and receives in return a part of the capital, the policy of the law requires him to know it, and conclusively charges him with knowledge. Thus selling, he sells at his peril. In no other way can the rights of creditors be protected. The seller can protect himself by selling to other parties, or he may hold his stock, taking, as he is bound to, the risk of his investment. The creditor is not bound to assume any part of the stockholder's risk, and he has no way of protecting himself. The law is his only protection.

The case of E. R. Gurley is peculiar. He was employed by the president and treasurer to buy stock for the company. He bought five shares of one Lincoln, apparently for himself, paying for it with his own money. He did not intend that the stock should be transferred to him, but directed Lincoln to take the certificate to Royce, supposing it would be transferred to the company. But Royce, for the purpose of concealing from Lincoln the real purchaser, transferred it to Gurley, and it was afterwards by Gurley transferred to the company. When Lincoln transferred the stock to Gurley, Royce placed to Gurley's credit the amount

he had paid for it. It is very evident that the receivers have no claim on Lincoln, for he sold and transferred to Gurley and received his pay from him, so that no trust money can be traced into his hands, and the trust company purchased no stock of him. There is nothing legally wrong in this transaction, actually or constructively, on the part of Lincoln. The case then lies between Gurley and the creditors. One or the other must lose. The party having the best title to it must prevail. The money burdened with the trust is traced directly into the hands of Gurley, he receiving it with full knowledge of the trust. He was the apparent real and legal stockholder, and, with notice of the illegality, he transferred the stock to the company. On the other hand the creditors have done nothing and omitted nothing by which they have forfeited their right to this portion of the trust fund. Their equities therefore are superior to Gurley's.

The case of John G. Keigwin is also peculiar. He was employed by the company to purchase stock on its account. He purchased five shares of William Reynolds in his own name. That stock was paid for by Royce with funds of the company. The stock was transferred to Keigwin, and in a few days thereafter he transferred it to the company. His case differs from the one last considered in this—he did not actually receive any money from the company, it having been paid directly to Reynolds. Is that circumstance sufficient to relieve Keigwin of responsibility? It seems quite clear that the creditors should have a claim either against Keigwin or Reynolds. Otherwise a door is left open by which creditors may in fact be defrauded in future cases; that is, this case will suggest a mode by which stockholders may transfer their stock to the company and escape liability.

If Reynolds is liable Keigwin ought not to be. Is Reynolds liable? So far as he was concerned it was a direct sale to Keigwin. He did not know the company in the transaction, and he cannot be charged with knowledge actual or constructive of any illegality in it, and he had no knowledge that the money which he received was the

money of the company. We are at a loss, therefore, to see how he could have been held responsible.

Is Keigwin equally innocent? He was assisting this company in distributing its capital among the stockholders. He was a member of the company, and, as such, was chargable with knowledge of the effect and consequences of what he was doing. He was also a trustee, and, as such, it was his duty to guard and preserve that capital so that it might be applied, if need be, to the purposes of the trust. In gross violation of his duty he actively participated in transactions which were designed to place the capital in the hands of stockholders and beyond the reach of creditors. It is difficult to see why he is not liable for a breach of trust. But aside from that; in pursuance of his illegal purpose he in law and fact became a stockholder in place of Reynolds, and afterwards conveyed the stock to the company. It matters not that he purchased it while he was agent of the company, for he in fact purchased it as his own and not as agent. He did not disclose his principal, so that Reynolds could have had no claim on the company, and cannot be charged with selling stock to the company. In this state of things Keigwin is not in a condition to invoke the favorable consideration of the court, and the court is not anxious to relieve him of any embarrassment which came to him incidentally in the prosecution of an illegal transaction. But more than this; there are certain technical considerations, which, as they are in the line of and in harmony with the equities of the case, we do not hesitate to refer to. The company could not legally be a purchaser of this stock. That legal incapacity of the principal, added to the fact that the agent expressly contracted in his own name, shows conclusively that the contract was in law as well as in fact with the agent. After the stock was conveyed to Keigwin and before it was conveyed to the company, he was to all intents and purposes its owner. It matters not that the company paid for it; nor that it had a claim on him, either for the stock or the money paid; nor that he discharged that obligation by transferring the stock

Crandall *v.* Lincoln.

to the company. Those are matters with which the creditors had no concern, and which the law will not notice for the purpose of regarding the company as the purchaser. Keigwin was a stockholder; the company paid for his stock; in law the money so paid was paid for his benefit. These facts are not changed or modified by the fact that he subsequently discharged his obligation to the company by transferring to it the stock in question. The creditors have a right to regard him as the owner of the stock at the time he so transferred it, and as having sold it for a valuable consideration. As to them he will not be permitted to deny that he was a stockholder.

A question somewhat analagous to this arose in the *Matter of the Reciprocity Bank*, 22 N. York, 9. The bank took some shares of its own stock for debts due to it, and the stock was re-issued to purchasers. Afterwards the bank became insolvent and the stockholders were assessed under a statute making them personally liable. The purchasers claimed that they were exempt from assessment on the ground that the bank could not deal in its own stock, and consequently that they derived no title to the stock thus purchased. The court in holding them liable said:—"They became actually the purchasers, and they voluntarily suffered their names to appear as stockholders on the books. They cannot in this proceeding impeach their own title. * * * But if a party makes an actual purchase of shares, whether from the bank or an individual holder, and voluntarily allows himself in this manner to be represented to the world as a stockholder, he must take the responsibilities of that situation. He comes within the terms and the policy of the act. His title may be imperfect; equities may exist between him and other parties; the shares may be in dispute; they may be claimed by some one else in hostility to his own right. The statute has no regard to such questions. The person who has caused or allowed his title to be registered on the books cannot deny the truth of that representation and disavow the ownership when it ceases to be a benefit and comes to be a burden."

So in this proceeding the law will not allow Keigwin to impeach his own title, and will take no note of any questions existing between him and the company.

Whiting Hayden transferred no stock to the company and no judgment is claimed against him. George S. Moulton and Joel R. Arnold having deceased, the suit abates as to them. The other defendants made no special defense and are liable for the reasons above stated.

We entertain no doubt that this suit was properly brought in the name of the receivers. They are charged with the duty of closing up the affairs of the corporation. Session Laws of 1879, p. 365; Gen. Statutes, p. 288. By statute they were required to pay the avails of the assets to the creditors. That necessarily carries with it the requisite power to sue for and collect all choses in action and other claims. That must include the power to collect or convert into money all the property and claims of every description to which the creditors are equitably entitled. To allow creditors to bring suits in such cases, unless possibly under peculiar circumstances, if practicable, would be highly inconvenient and contrary to the policy and spirit of the statute.

Another question made is, that there is adequate remedy at law, and therefore that a court of equity has no jurisdiction.

Equity takes cognizance of all trusts, and a court of equity is the proper tribunal to enforce the equitable rights of the beneficiaries therein. The case of *Catlin* v. *The Eagle Bank*, 6 Conn., 233, has been cited to show that the assets of a corporation do not constitute a trust fund for creditors even after the insolvency of the corporation. That case when rightly understood hardly sustains that position. We cannot believe that the court intended to establish a rule which should be contrary to the overwhelming current of authorities in nearly every other jurisdiction. In that case the directors of an insolvent bank preferred certain creditors with the assets of the bank. Other creditors brought a bill in chancery, the object of which was to

allow all the creditors to share in those assets. The court held that the directors might, as the law then stood, lawfully prefer creditors; and that the other creditors had no equitable rights in the assets appropriated for that purpose which a court of chancery could enforce. The most that can be claimed is, that the court did not regard the rule which we think exists as applicable to that case. The question whether the directors will be permitted to distribute the stock among the stockholders to the prejudice of creditors did not arise, and we do not understand that the reasoning of the court will allow that to be done.

In Pomeroy's Equity Jurisprudence, vol. 2, § 1048, the rule on this subject is stated so fully and satisfactorily, and it is so well sustained by the authorities cited, that we cannot forbear quoting it:—" Wherever property, real or personal, which is already impressed with or subject to a trust of any kind, express or by operation of law, is conveyed or transferred by the trustee, not in the course of executing or carrying into effect the terms of an express trust, or devolves from a trustee to a third person who is a mere volunteer, or who is a purchaser with actual or constructive notice of the trust, then the rule is universal that such heir, devisee, successor or other voluntary transferee, or such purchaser with notice, acquires and holds the property subject to the same trust which before existed, and becomes himself a trustee for the original beneficiary. Equity impresses the trust upon the property in the hands of the transferee or purchaser, compels him to perform the trust if it be active, and to hold the property subject to the trust, and renders him liable to all the remedies which may be proper for enforcing the rights of the beneficiary. It is not necessary that such transferee or purchaser should be guilty of positive fraud, or should actually intend a violation of the trust obligation; it is sufficient that he acquires property upon which a trust is in fact impressed, and that he is not a *bonâ fide* purchaser for a valuable consideration and without notice. This universal rule forms the protection and safeguard of the rights of beneficiaries in all kinds of

trusts; it enablês them to follow trust property—lands, chattels, funds, securities and even money, so long as it can be identified, into the hands of all subsequent holders who are not in the position of *bonâ fide* purchasers for value and without notice; it furnishes all those distinctively equitable remedies which are so much more efficient in securing the beneficiary's rights than the mere pecuniary recoveries of the law." We make this long quotation the more readily because it seems to cover many of the questions involved in this case. See also 2 Story's Eq. Jurisprudence, § 1252; Perry on Trusts, § 242; Wood's Fields on Corporations, 518, 519, and cases cited.

We advise the Superior Court to render judgment against all the present defendants except Whiting Hayden.

In this opinion the other judges concurred; except STODDARD, J., who was of opinion that the defendant Keigwin should not be held liable, but concurred in all other respects.

*Note.* Judges BEARDSLEY and STODDARD of the Superior Court sat in the places of Judges PARK and PARDEE, disqualified by interest.