ALEXANDER REID *et al.*, plaintiffs in error, *vs.* the EATONTON MANUFACTURING COMPANY *et al.*, defendants.

1. When neither the charter of a corporation, nor any general statute, imposes on the individual members thereof a liability to pay its debts, such liability can not be imposed by a by-law of the corporation. And the fact that the individual members of the corporation may have represented to the public that they were so liable, will not bind them *as stockholders*, nor will equity entertain a bill against them as stockholders, under such by-law, or on account of such representations. If they have incurred liabilities as individuals, disconnected with their corporate capacity, they should be proceeded against in their individual character and not in their capacity as stockholders.

2. When the charter of a manufacturing company, imposes no personal liability on the stockholders, the creditors trust the corporation, upon the faith of the capital stock, as the only means of re-payment. And they have no right, after the corporation is dissolved, or has become insolvent, by reason of the destruction of its property by an army during war, to call upon the stockholders to account for dividends made in good faith, in the regular transaction of the business of the company, from the incomes arising from the sale of articles produced by it, at a time when the company was prosperous, and its property, held as capital stock, was considered ample for the payment of all its indebtedness

3. If the parties who used the factory for one year, are due anything for rent to the corporation, a judgment creditor of the corporation has an ample remedy at law, and may reach it by process of garnishment.

Personal Liability of Stockholders, etc. Equity. Before Judge ROBINSON. Putnam Superior Court. September Term, 1869.

Alexander Reid *et. al.*, as creditors of the Eatonton Manufacturing Company, by their bill, made this case: In 1835 the General Assembly of Georgia incorporated said company,

as a cotton and wool factory, with the usual powers of a corporation. Under this charter, the company began business, with a capital of $50,000 00. In June, 1849, having made say $40,000 00 in profits, the capital stock was increased to $75,000 00 and distributed among the original stockholders *pro rata.* The stockholders, and their respective shares, are stated, as also the changes caused by deaths and transfers. The company had no capital except that invested in the factory and machinery, and depended upon borrowing money to do business. In order to gain credit, by certain stockholders, representing largely over half the stock, in June, 1849, it was resolved that loss or gain should be shared by the stockholders according to their stock and that the stock and private estate of each stockholder should be liable for the debts of the company, in proportion to the shares held by each. And after this resolution was passed, the stockholders held themselves out to the world as individually bound, as aforesaid. Upon this understanding it became habitual for the several members to stand the company's security; sometimes one and then another of them would do so. On such understanding, Adams, a stockholder, stood its security to Alexander Reid, and he and the company were sued and a judgment was had against them. Said Reid loaned the company money, sold them corn, provisions, cotton, etc., on credit, and in fact wholly sustained it. He would not have done so but for such personal liability, and of this he told them. The factory, etc., were destroyed by Sherman's army, in 1864. The company is dissolved and insolvent, owing say $60,000 00 and its corporate assets being worth not more than $10,000 00. Reid's said judgment amounts to $20,-000 00. The Stay law, an indisposition to sacrifice the property, etc., prevented Reid from selling the property under said judgment. A sale by this and other judgments will disclose the exact amount of remaining indebtedness for which the individual stockholders must respond, and the *pro rata* share due from each.

In 1861, when Reid ceased to credit the company and sued it, the company resolved to suspend operations and sell out

the corporate property, and did suspend till about the 30th of October, ——, when certain named stockholders formed a partnership for working the factory, under the name of the Putnam Manufacturing Company, and worked for one year. The rent of the corporate property, for that year, was worth $2,000 00, which the partnership never paid, though it made very large profits, say $100,000 00. On the 11th of September, 1862, stockholders of the corporation, representing a majority of the stock, when the corporation was insolvent and Reid's demand was in judgment, as they well knew, resolved to resume operations, taking the chances of working upon credit and did so work the factory till its said destruction. They declared monthly dividends, from sixty to one hundred per cent. upon the stock, during the first year, and paid these dividends to the stockholders, in disregard of Reid's superior claim. For the year ending the 18th of December, 1863, the nett dividends were $240,000 00 and the next year $250,000 00. How much of this each stockholder got is shown; said Adams got $4,000 00. Since said suspension, the President of the corporation has been running a grist and saw mill belonging to the corporation.

Complainants claim said rent, said dividends, and the profits on the grist and saw mill are held by the stockholders in equity as a trust fund to pay the judgments. They prayed for a Receiver to take charge of the property, for a discovery of said rents, dividends and profits, and that when the *quantum* in each stockholder's hands was discovered, he should be held personally liable for his share of their indebtedness, etc. This bill was demurred to for want of equity, or if it contained equity, because complainants' remedy at law was complete, and because it was multifarious in that it prayed for relief upon distinct grounds. The Chancellor sustained the demurrer and dismissed the bill. That is assigned as error.

WINGFIELD & CAPERS, for plaintiffs in error.

THOMAS G. LAWSON, NESBITS & JACKSON, for defendant.

BROWN, C. J.

The charter of this company contains no individual liability clause, and no general statute of this State imposed any such liability, when the charter was granted.   And we hold that it was not in the power of a majority of the stockholders, by any by-law which they might pass, to impose any such liability.   This very question is decided by the Supreme Court of Massachusetts in the Trustees, etc., *vs.* Flint.   13 Metcalf Reps., 539.   In that case the charter imposed no personal liability upon the stockholders.   But under the usual power given for that purpose, the stockholders met, and enacted by-laws, of which the following was one:   "The members of this association pledge themselves in their individual, as well as their collective capacity, to be responsible for all moneys loaned to this association and for repayment of which the treasurer may have given his obligation, agreeably to the direction of the directors."   This by-law was printed and distributed by the corporators.

John Flint, as the treasurer, afterwards executed the note sued upon, under this by-law.   Judgment was obtained against the corporation and execution issued and was returned "wholly unsatisfied."   Suit was then brought against Flint as a stockholder, and the Supreme Court of Massachusetts held that he was not liable.   They say:   "It is not, in the opinion of the Court, within the powers conferred upon this and similar corporations, to impose upon their members, by any such by-law, any personal and individual liability to third persons, beyond such as are specified in the charter, or in the general laws of the commonwealth.   Such a power would be liable to great abuse, and would subject any member of a corporation, however liberal its charter, in excluding individual liability, to be made responsible for the entire indebtedness of the corporation."   The Court adds:   "The proposed evidence (of the declarations of the defendant that such liability existed) would therefore be inadmissible on the trial of this case before the jury; as it would not tend to change the defendant.   Whether for such false representations he

may be held responsible to those to whom he made them, or who may have lent their money, upon the faith of them, is a question not now before us." We think this decision sound law, and we adopt it in this case.

2. Upon the other question made by this record we are also well satisfied. There is no allegation, by complainants, in the bill, that the corporation was insolvent when the dividends were made, or that there was any fraud or collusion to their injury. At that time the company was doing a profitable business, and the property held by them as capital stock was amply sufficient for the payment of all the indebtedness of the corporation. The dividends were no doubt made in good faith, without any intention to defraud or injure creditors, and made at a time when creditors were by no means anxious to receive the only currency of the country (Confederate Treasury notes) in payment of the debts due them. Afterwards the factory was burnt, during the war, by General Sherman's army, which reduced the company from a high state of prosperity to hopeless insolvency. Under these circumstances, we hold that creditors have no right to compel the stockholders to refund the dividends for their benefit.

The *capital stock* was a trust fund for the payment of the debts of the corporation, upon the faith of which alone the law presumes the credit was given, unless other security was taken at the time by the creditor. In the case of Wood *et. al.*, *vs.* Dummer *et. al.*, 3 Mason's Reports 311, Mr. Justice Story says : "It appears to me very clear, upon general principles, as well as legislative intention, that the *capital stock* of the Bank is to be deemed a pledge or trust fund for the payment of the debts contracted by the bank. The public, as well as the legislature, have always supposed this to be a fund appropriated for such purpose. The individual stockholders are not liable for the debts of the bank in their private capacities. The charter relieves them from personal responsibility and substitutes the capital stock in its stead. Credit is universally given to this fund by the public as the only means of repayment." The same rule which applies to a bank is applicable to any other corporation. Again Judge Story

says: "They (the stockholders) have the full benefit of all the *profits* made by the establishment, and cannot take any portion of the fund (the capital stock) until all other claims on it are extinguished."

The same doctrine is held by Judge Lumpkin in *Hightower vs. Thornton et. al.*, 8 *Georgia* 500, where he says: "The capital stock of a corporation, like that of a limited partnership, or joint stock company, under the Act of this State, of 1837, (Hotchkiss, 373) is the amount fixed upon by the partners or associations, as their stake in the concern. Upon *this* they get credit and transact business. It may not all be actually *paid in*, still they are liable to the public for the amount thus fixed. Additions on the other hand may be made to the original stock, by a successful prosecution of the business, still these *profits* do not constitute *capital.*"

We are satisfied this bill is not maintainable upon either of the grounds taken. If any of those who constitute the stockholders of this company have been guilty of fraudulent misrepresentations in procuring credit for the corporation, they are liable in a proper form of action, as individuals, to any one injured, just as they would be for like fraud in any other matter; but they are not liable, as stockholders, under this by-law, for the debts of the corporation, nor are they liable to refund the dividends received by them, under the circumstances detailed by this bill, for the benefit of creditors. They must look to the corporate property— the capital stock—for satisfaction, and to such other personal security as they may have taken for their better protection.

Establish the rule that creditors may compel the stockholders of an insolvent corporation to refund dividends received in a fair course of business and no man would be safe in holding stock. At the time the dividends are made, the corporation may be in a prosperous condition, as was the case here, and a stockholder may receive the dividends in good faith as the legitimate incomes of his capital, and after he has sold his stock and ceased to have any interest in the company, some calamity may befall the company, which may cause its insolvency, and creditors, under the rule contended for, may

compel him to repay the dividends, with interest, for their benefit.    We do not think dividends already paid out are a trust fund for the payment of debts, which may be followed by creditors in a Court of Chancery and recovered for that purpose.

But we will not say that in a proper case, where the corporation is insolvent, and the capital stock, upon the faith of which the credit was given, has become insufficient for the payment of the debts of the company, a case might not be made where a Court of Equity would enjoin the payment of future dividends to the stockholders, till the debts are paid. Nor do we question the right of the creditors, in a Court of Equity, to compel stockholders to refund dividends made to them out of the capital stock itself.    The whole capital stock is a trust fund for the payment of the debts contracted upon the faith of it, which the stockholders can not divert from that object, by distributing it as dividends, or otherwise dividing it among themselves.

3. In reference to the rent claimed by these creditors, for the use of the factory, during the year when it was run by part of the stockholders, under the name of the Putnam County Manufacturing Company, we have only to remark, that if anything is due the company, a judgment creditor has an ample remedy at law, and can reach it by process of garnishment.

Let the judgment be affirmed.