### FITZPATRICK *v.* McGREGOR, receiver.

1. An action at law may, by amendment, be converted into an equitable proceeding, and when this is done it is not necessary for the judge to submit exceptions of fact to an auditor's report to a jury, unless they be approved by him, and whether they should be approved is in his discretion.

(*a*) The allegations of the petition as amended and the prayers for relief made this an equitable proceeding.

2. A solvent stockholder of an insolvent corporation delivered to it his shares of stock in consideration that his note held by the corporation, secured by his stock as collateral, be credited with a given amount considered by him and the president of the corporation as a fair valuation of the stock; at the time of the transaction both the stockholder and the president thought the corporation solvent, and the shares of stock were held by the corporation until it made an assignment for the benefit of creditors within a month or two thereafter. *Adjudged,* that the stockholder held the money or credit so received by him subject to the superior equity of the creditors of the corporation, and that a receiver subsequently appointed for the corporation could recover of the stockholder, for the benefit of creditors, the amount of such credit.

3. In such a case the receiver could recover of the stockholder interest on

the amount of the credit received by him on his note at the same rate the note bore.

4. In an equitable action the judge may, in his discretion, tax the entire fee of the auditor upon either of the parties, and the exercise of such discretion will not be interfered with, unless abused.

Argued January 22,—Decided October 1, 1909.

Exceptions to auditor's report. Before Judge Worley. Warren superior court. April 6, 1908.

*Howard Van Epps* and *E. P. Davis,* for plaintiff in error

*L. D. McGregor* and *Samuel H. Sibley,* contra.

FISH, C. J. In an action brought by McGregor, in the capacity of receiver of the Bank of Warrenton, against Fitzpatrick, the substance of the petition, as amended and as now material, was: In 1901 the bank held defendant's note, payable to it, for $6,000. At that time the defendant was the owner of ten shares of the capital stock of the bank, and in addition thereto controlled five shares owned by his wife and five shares owned by his mother-in-law. Defendant delivered these twenty shares to the president of the bank, who, in consideration thereof, allowed defendant credit for $2,500, returned to him his note for $6,000, and accepted his note for $3,500, payable to the bank. The president had no authority from the board of directors to do these acts. At the time of this transaction the defendant was solvent and the bank insolvent. The bank's capital stock was only $20,500, and it had no surplus. Defendant has never paid the $2,500 represented by the credit so allowed him. The indebtedness still due to the bank's creditors, who were such at the time of this transaction, is about $16,000 due to depositors, and $10,000 due to its other creditors, and it is necessary for the plaintiff, as receiver, to recover from the defendant, for the benefit of these creditors, the $2,500 with interest thereon, which, under the circumstances set forth, he justly owes. The twenty shares of stock are tendered to defendant. Discovery is waived. Petitioner prays that defendant be required to produce the note for $6,000, and that petitioner have judgment against him for $2,500 and interest. An amendment to the petition closed as follows: "Your petitioner further shows that in surrendering said stock and withdrawing said $2,500 said Fitzpatrick was in effect withdrawing $2,500 of the capital stock of said bank, the same having no surplus, and said money was a part of said capital and was a trust fund for the benefit of creditors, and in taking the same

with the result of leaving the creditors of the bank unpaid was a misuse thereof, and in equity said Fitzpatrick holds the same as trustee for the benefit of creditors of said bank, and in equity is bound to restore the same with interest, the whole thereof being necessary to pay said creditors.   Petitioner prays that said credit be cancelled and said stock be decreed to be returned to said Fitzpatrick and said transaction cancelled and set aside, and that defendant be decreed to hold said asset in trust, and for judgment as aforesaid.   And petitioner prays for such other relief as is equitable."

The substance of defendant's answer as amended was:   The note for $6,000, given by defendant to the bank, was given partly in renewal of a note previously given which was secured by the twenty shares of stock afterwards surrendered to the bank.   At the time defendant disposed of such stock to the bank he was indebted to it $3,000 in addition to the $6,000 note, and owed and was liable to others in sums set out, which rendered him insolvent.   He had no knowledge then of the bank's insolvency, and had no reason for believing it to be so, but supposed it to be solvent, as the president of the bank allowed him a premium of twenty-five per cent. for the stock, which was its then market value.   Defendant had no notice of the insolvency of the bank until within a few days before it made an assignment.   Allen, president of the bank, knew defendant to be insolvent, and received the twenty shares of stock, at a premium of twenty-five per cent., on defendant's note, and did so to save the debt and prevent loss to the bank.

Defendant demurred to the petition on the grounds:   (1) it sets forth no cause of action; (2) the receiver has no right to sue in the case; (3) the transaction between defendant and the bank, as disclosed by the petition, was closed before the bank executed a deed of assignment, and the receiver has no right to set it aside; (4) a prior suit by the assignee of the bank for the same cause of action is pending.   The demurrer was overruled, and no exception taken to such ruling.   At the trial term the case, by consent of the parties, was referred to an auditor to hear and determine the law and the facts thereof.   The report of the auditor as to his findings of fact was as follows:   "1st.   I find that on the 12th day of March, 1901, C. R. Fitzpatrick gave to the Bank of Warrenton his note for six thousand dollars, and due Nov. 18, 1901, and that

this note was secured by transfer of twenty shares of stock of said bank and a lot of promissory notes are security therefor. 2nd. That C. R. Fitzpatrick's total indebtedness to the Bank of Warrenton during the summer of 1901 was about eleven thousand dollars, and that in the latter part of the summer of 1901 J. F. Allen, president of said bank, asked Fitzpatrick to reduce his indebtedness. 3rd. That this note of six thousand dollars was settled on or before the 12th day of December, 1901, by Fitzpatrick giving up the twenty shares of stock in said bank, held as security for the note, for which he was allowed by the president of said bank a credit of twenty-five hundred dollars, and then giving a new note for thirty-five hundred dollars secured by mortgage on six hundred acres of land. That this thirty-five-hundred-dollar note has since been paid. 4th. That at the time of settlement of this six-thousand-dollar note the management of said bank had been by the directors turned over almost entirely to J. F. Allen, president, who owned and controlled a majority of the stock. That said Allen only had a general authority to manage the affairs of said bank, make loans, collect debts, &c., and the authority tacitly given by the directors allowing him full control and management. That no express authority was given him by the directors to take stock in part payment of this debt. 5th. That nothing was said, at the time of the settlement, as to what would be done with the stock by Allen, president, and Fitzpatrick did not know what he intended to do with it. 6th. That said stock was not resold by the bank, but held just as it had been since transferred to it as security for this debt, until Jan. 18, 1902, when there was an attempt to retire it by charging it off from the capital stock. 7th. That at the time of this transaction J. F. Allen, president, and C. R. Fitzpatrick considered the bank solvent and that the stock was worth the price agreed upon, and both acted in thorough good faith. 8th. That the Bank of Warrenton at the time of this transaction was apparently solvent and afterwards declared a semi-annual dividend of four per cent., and passed an amount to surplus fund, while as a matter of fact, as was afterwards disclosed, it was not solvent. 9th. That C. R. Fitzpatrick owed a large amount of money at the time of this transaction, but was solvent, as after events showed."

Each party filed exceptions of law and exceptions of fact to the auditor's report, which, under the view that we take of the case,

are not necessary to be set forth. The court, upon consideration of the exceptions of law and the exceptions of fact, ordered the exceptions of fact of both parties stricken, overruled defendant's exceptions of law, sustained plaintiff's exceptions of law, and, upon the facts as found by the auditor, decreed that plaintiff, as receiver, recover of the defendant $2,500, with interest thereon at eight per cent. per annum from January 18, 1902, the same "being funds for the benefit of creditors, and that upon the payment thereof said receiver redeliver to said defendant the certificates of stock in said bank in the pleadings mentioned, which are declared to have been held by him as security only for said debt." It was further decreed that defendant pay all costs and the fee of the auditor. The defendant, in his bill of exceptions, assigned error upon the overruling of his exceptions to the auditor's report and upon the decree rendered against him. The plaintiff by cross-bill assigned error upon the overruling of his exceptions of fact.

1. One of the assignments of error in the main bill of exceptions is, that the court erred in not submitting to a jury the issues raised by the exceptions filed by the plaintiff in error to the facts found by the auditor, the contention being that the action was one at law and not in equity, and that therefore the plaintiff in error was entitled to his constitutional right of a jury trial. The allegations of the petition as amended and the prayers thereof made the action one in equity. The action was to make the defendant, a stockholder of the bank for which the plaintiff was receiver, liable, for the benefit of creditors of the bank, for the amount of a credit allowed defendant by the bank, while insolvent, on a note held against him by the bank, and in consideration of a sale by him to the bank of a given number of its own shares of stock. In other words, the cause of action set forth was the alleged equitable right of the creditors of an insolvent bank, through its receiver, to have an accounting by the defendant, a stockholder, as to the fund withdrawn by him from the assets of the bank and necessary to satisfy their claims against it. Discovery was waived; and the prayers were, for a cancellation of the credit, for a decree that defendant holds the amount of such credit in trust, and for such other relief as is equitable. A suit at law may, by amendment, be converted into an equitable proceeding; and when this is done it is not necessary for the judge to submit exceptions of fact to an

auditor's report to a jury, unless they be approved by him, and whether they should be approved is in his discretion. *Collinsville Granite Co.* v. *Phillips,* 123 *Ga.* 830 (10), (51 S. E. 666).

2. The rule being that in an equity case, when there is evidence to sustain the findings of the auditor, the judge, if satisfied therewith, need not submit the exceptions of fact to a jury (case cited above and *Austin* v. *Southern Home Association,* 122 *Ga.* 439 (50 S. E. 382)), and an examination of the evidence reported by the auditor in the case under consideration disclosing that his findings of fact were amply supported by evidence, the question arises, did the judge err in rendering the decree? "The banks of this State are now prohibited by law from using any part of the capital stock in the purchase of their own shares (Civil Code, §1968), and the president and director so using the capital stock of the bank are indictable as for a felony. Penal Code, §211." *Crawford* v. *Roney,* 126 *Ga.* 763 (55 S. E. 499). The provisions of section 211 of the Penal Code have been in all the codes of this State, at least since the Penal Code of 1833 (Cobb, 798). The language of section 1968 of the Code of 1895, viz., "nor shall the capital stock [of a bank] be applied to the purchase of its own shares," appears for the first time in that code, and was evidently codified as a consequence of the penal provisions of the several previous codes, making it a felony for the president or a director of a bank to purchase its shares with its capital stock. In *Hartridge* v. *Rockwell, R. M. C.,* 260, decided in 1828, Judge Davies, of the superior courts, held that if the capital of a bank can not be usefully employed in loans, there can be no objection to investing a portion thereof in the purchase of its own shares of stock; that while in such purchase a portion of the capital stock is withdrawn, it is represented by the stock purchased, and dividends declared thereon belong to the remaining stockholders; that directors have the right to dispose of such stock, and on a resale thereof stockholders have no right to a preference in the purchase. There was no question in the case as to the liability to creditors of a stockholder selling his shares of an insolvent bank to the bank. Moreover, as the decision was rendered by a superior court, it is, of course, not binding upon this court. In *Robinson* v. *Beall,* 26 *Ga.* 17, it was held: "The Planters and Merchants Bank of Columbus had the power to purchase and again to sell its own stock." Judge

Benning, delivering the opinion, said: "No law was read to us, prohibiting banks from acquiring title to their own stock. And we do not know of any such law. And as to this bank, its charter says that it shall be 'able and capable in law to have, purchase, receive, possess, enjoy, and retain' . . 'goods, chattels, and effects of what kind, nature, or quality whatsoever, and the same to sell . . or dispose of.' . . Here is an express grant of power to 'purchase,' and of power to 'sell,' every kind of 'goods, chattels, and effects.' . . So the third section of the charter declares that 'if there shall be a failure in the payment of any sum subscribed for,' the shares upon which such failure shall happen shall be forfeited, and they may be sold, and the proceeds of the sale, together with the sums paid on shares, shall revert to the benefit of the corporation." The ruling, therefore, seems to have been based upon the express power granted to the bank in its charter to purchase and sell every kind of goods, chattels, and effects. The bank was incorporated in 1836. The action was by a holder of the bills of the bank, upon which judgment had been obtained against its assignee appointed by the State, against a stockholder to make him liable for the payment of the bills, under a clause of the bank's charter to the effect that the property of stockholders should be bound in proportion to the amount of shares and the value thereof held by each for the ultimate redemption of the bills and notes of the bank. The ruling that the bank had the power to purchase and again to sell its own stock was made in passing upon the objection by the defendant to the admissibility in evidence of a transfer of a portion of the stock in question to himself, made by the cashier, such transfer being objected to on the ground that "the bank could not transfer stock"—the meaning of the objection being, as interpreted by the court, that the bank was forbidden to become the owner of its own stock, and therefore could not have any stock to transfer. No question as to the rights of a creditor of an insolvent bank against a stockholder thereof, who had sold his shares to the bank while it was insolvent, was involved in the case. The decision was rendered in 1858, and we are at a loss to conceive why the learned judges who presided in the case did not recall the provisions of the Penal Code of 1833, making it a felony for the president or a director of a bank to use any part of its capital stock in the purchase of its own stock, or why the distinguished lawyers

engaged in the case failed to call the court's attention to such provisions. In view of the re-enactment of such provisions in the adoption of the Penal Code of 1895, and the enactment in the same way of section 1968 of the Civil Code of 1895, declaring that "No dividends shall be declared by any bank except from net profits, nor shall the capital stock be applied in the purchase of its own shares," we are not bound to follow the ruling made in *Robinson* v. *Beall,* supra, even if it can be construed as holding that any bank in this State may purchase and resell its own stock. The same may be said of the case of *Robinson* v. *Bank of Darien,* 18 *Ga.* 65, 92, where the language of Judge Davies in *Hartridge* v. *Rockwell, R. M. C.* 260, is approvingly quoted. The law of this State is, as it was in effect announced in *Crawford* v. *Roney,* supra, that the banks thereof can not validly use any part of their capital stock in the purchase of their own shares. While it is not at all necessary to discuss the policy of our statutes prohibiting such use of their capital stock by banks, it may not be out of place to say that in England, and in some of the States of this country, it is held that an express grant of authority is necessary to enable a corporation to purchase shares of its own stock, either for the purpose of reissuing or retiring them. This view is generally based, not only upon the ground that a corporation can not increase or diminish the amount of its capital stock as fixed by the legislature (Crandall *v.* Lincoln, 52 Conn. 73 (52 Am. R. 560) ; Southerland *v.* Olcott, 95 N. Y. 100), and on the ground that such a transaction is a fraud upon the stockholders and creditors (Crandall *v.* Lincoln, supra; 2 Thomp. Corp. §2054), but also on the ground that it is foreign to the purposes for which the corporation was created, and therefore a violation of its charter, and a diversion of its funds to an unauthorized purpose. See Trevor *v.* Whitworth, 12 App. Cas. 409; Coppin *v.* Greenlees & Ransom Co., 38 Ohio St. 275 (43 Am. R. 425) ; Morgan *v.* Lewis, 46 Ohio St. 1 (17 N. E. 558); German Savings Bank *v.* Wulfekuhler, 16 Kan. 60; Abeles *v.* Cochran, 22 Kan. 405 (31 Am. R. 194) ; Cartwright *v.* Dickinson, 88 Tenn. 466 (12 S. W. 1030, 7 L. R. A. 706, 17 Am. R. 910). It follows that in these jurisdictions a purchase of its own shares by a corporation is none the less ultra vires because it is made in good faith, and without any intention to defraud creditors, and the selling shareholder is not relieved from liability for contribution in the settle-

ment of the debts of the corporation on a winding up of its affairs.
1 Clark & Mar. Corp. §199; Note to Commercial Natl. Bank *v.*
Burch (141 Ill. 519, 31 N. E. 420) in 33 Am. St. Rep. 331, 339,
and cases there cited.    In this Illinois case it was held: "Purchase
of its own stock by a corporation by exchange for its own property
of equal value, though made in good faith and without any element
of fraud, or anything in the apparent condition of the corporation
to interfere with the making of the exchange, will not be allowed
when it injuriously affects a creditor of the corporation, even though
the fact of the indebtedness is not at the time established or known
to the stockholders.    The capital stock of a corporation is a fund
set apart for the payment of its debts, and the directors hold it in
trust for that purpose.    The stockholders of the corporation are con-
clusively charged with notice of the trust character which attaches
to its capital stock; as to it they can not occupy the status of in-
nocent purchasers, and when they have in their hands any of this
trust fund, they hold it cum onere, subject to all equities which at-
tach to it."    The same ruling was made in Clapp *v.* Peterson, 104
Ill. 26.    The current of American authority seems, however, to be
opposed to the doctrine announced by the English courts, as in this
country it is very generally maintained that, in the absence of stat-
utory prohibition, a solvent corporation or its officers may invest
its funds in the purchase of its own stock, or may take such stock in
payment of debts due it by the stockholder, or may take it in ex-
change for other property owned by the corporation.    It seems,
from an examination of the decisions upon the subject, that the
creditors of the corporation can question such purchase or exchange
only when the circumstances are such as to show that the transac-
tion was fraudulent in fact, or that the corporation was insolvent,
or in process or contemplation of dissolution at the time the pur-
chase or exchange was made, and also that the transaction dimin-
ished their security for the debts due them. Note in 33 Am. St. Rep.
339; Frazer *v.* Ritchie, 8 Ill. App. 554.    In the case last cited it
was said in the opinion: "If in contemplation of winding up, or
when insolvent, a corporation should attempt to divide its effects
among its stockholders, either directly or indirectly, by accepting a
surrender of their stock in exchange for the corporate property, the
transaction would not be upheld as against the equitable rights of
creditors; and this, it is apprehended, is the limited application of

the doctrine which American courts and text-writers have intended
when speaking of the trust property of the capital stock, rather
than that general and universal application which would deprive a
corporation of all power and discretion in respect of the disposition
of its capital stock." Where it is held by the courts of this country
that, in the absence of statutory prohibition, a corporation may pur-
chase its own stock, it is generally ruled that such purchase will
be declared illegal and voidable at the instance of creditors who are
injured thereby, on the ground that under and by such purchase
the corporate funds are expended, and no property is received by
the corporation, except the right to sell the stock. These cases also
maintain, as a general rule, that the money paid by the corporation
for its own stock is a trust fund in the hands of the stock seller,
and that it may be pursued by the corporation creditors when the
purchase is to their injury. Note in 33 Am. St. Rep. 343; Crandall
v. Lincoln, supra; Currier v. Lebanon Slate Co., 56 N. H. 262;
Gill v. Balis, 72 Mo. 424; Heggie v. People, 107 N. C. 581 (12 S.
E. 275); Bent v. Hart, 10 Mo. App. 143; German Savings Bank
v. Wulfekuhler, supra; Coppin v. Greenlees etc. Co., supra. Note
to In re Brockway Mfg. Co., 56 Am. St. Rep. 406; Monographic
note to Buck v. Ross, 57 Am. St. Rep. 63-84. The Supreme Court
of Connecticut, in 52 Conn. 73-99, said: "Where it is provided by
law that each stockholder, in case of insolvency, shall be liable to
contribute a sum equal to the nominal value of his stock, there is
an obvious reason why the company can not become a stockholder.
If it may, it withdraws from the fund designed to secure creditors
a sum equal to the nominal value of the stock so owned. But in
this case, and in other cases where stockholders are not liable to
contribution, the only security which creditors have being the capi-
tal stock, it is very important that the law should guard that se-
curity with the greatest care and vigilance, and not allow trust
funds belonging to creditors to be appropriated by stockholders who
have no equitable right to them. These views are abundantly sus-
tained by authority. We do not intend to say that under no cir-
cumstances can a corporation legally become the owner of its own
stock. Should it loan money to a stockholder, and be obliged to
take its own stock in payment, that would not be illegal per se. . .
But as a rule, to which there are few if any exceptions, when a
stockholder conveys his stock to the company, and receives in return

a portion of the capital, he holds the money so received as subject to the superior equities of creditors. Our conclusion is that the capital stock of the company being impaired when the stock in this case was purchased, and the stock in each case having been paid for from the capital, the transactions were illegal, and can not be sustained. If the view we have taken of the character and nature of this stock is sound, that it is a trust fund for the security of creditors, and we have no doubt that it is, the conclusion inevitably follows that under no circumstances can a stockholder sell his stock to the company and take therefor his portion of the capital stock to the prejudice of creditors. The illegality of the transaction does not at all depend upon the actual knowledge or mala fides of the seller, if he in fact sells to the company and receives in return a part of the capital; the policy of the law requires him to know it, and conclusively charges him with knowledge. Thus selling he sells at his peril. In no other way can the rights of creditors be protected. The seller can protect himself by selling to other parties, or he may hold his stock, taking, as he is bound to, the risk of his investment. The creditor is not bound to assume any part of the stockholder's risk, and he has no way of protecting himself. The law is his only protection."

In many cases, even where the power on the part of a corporation to purchase shares of its own stock is denied, it has been held, that, in order to prevent loss, a corporation has authority, in the absence of express restrictions, to take its own shares in payment of a debt previously contracted. Clark & Mar. Corp. §202, and cases cited. The doctrine that the capital stock of a corporation is deemed a trust fund for the payment of its debts has been recognized by this court. *Hightower* v. *Thornton,* 8 *Ga.* 500 (52 Am. D. 412); *Robinson* v. *Bank of Darien,* 18 *Ga.* 86, 87; *Schley* v. *Dixon,* 24 *Ga.* 273 (71 Am. D. 121); *Reid* v. *Eatonton Mfg. Co.,* 40 *Ga.* 102 (2 Am. R. 563); *Moses* v. *Eagle & Phenix Mfg. Co.,* 62 *Ga.* 456. We know of no case wherein it is held that an insolvent corporation has the power to purchase its own shares of stock. Without regard to what is the sounder view as to the power of a corporation, in the absence of statutory prohibition, to purchase its own stock, it must certainly be true that if the corporation at the time of making such purchase is in an insolvent condition, and therefore the purchase is to the prejudice of its creditors by diminishing their chances of col-

lecting their claims, the transaction can not be sustained, and the selling stockholder who thus receives a portion of the capital holds the same subject to the superior equities of creditors.    In the present case, at the time Fitzpatrick conveyed his stock to the bank he was solvent (and of course there was no necessity for taking his stock to save the debt, nor did the auditor find that such a necessity existed), the bank was insolvent, and Fitzpatrick received in return for his stock a portion of the bank's capital by way of having his note, held by the bank, credited with the amount of the supposed value of his stock, thereby decreasing the capital to which the creditors of the bank had the right to look for the satisfaction of their claims; and we have no hesitancy in ruling, especially in view of our statutes prohibiting banks from applying their capital stock to the purchase of their own shares, that Fitzpatrick held the money or credit so received subject to the superior equity of the creditors, although he acted in good faith and without actual knowledge of the bank's insolvency.

3.    The plaintiff in error does not assign error upon the overruling of his exceptions of law to the auditor's report, and such exceptions do not appear in the bill of exceptions or in the record.    Error is, however, assigned on the decree, in that interest on the $2,500 was adjudged against the plaintiff in error, at the rate of eight per cent. per annum, from January 18, 1902.    This point, in our opinion, is without merit.    The action was not for damages for a fraud coupled with injury, but was to recover the amount received from the bank by the defendant stockholder, while the bank was insolvent, as a credit on his note due the bank, which note, as appears from the evidence, bore interest at eight per cent. per annum.    This note was a solvent asset of the bank, and it is clear that the defendant in this action, who received from the bank a credit thereon, should be held liable for the same rate of interest that the portion of the fund he received was bearing; to hold otherwise would permit him to receive a benefit from his own wrong.    If he had received from the bank the solvent note of some other person held by it, bearing eight per cent. interest, it is manifest, we think, that he would be liable for the rate of interest such note carried.    Suppose an equitable suit had been prosecuted to compel a restoration by the defendant of his note to the receiver of the bank, and after a decree that it be restored an action had been brought by the receiver on the note, it

is clear that the defendant in such action would have been liable for interest at the rate the note bore.

4. The amount of the auditor's fee was agreed upon by the parties. The judge decreed that the whole of the fee should be paid by the defendant below, the plaintiff in error, who assigns error upon this ruling. The fee of an auditor is in the nature of costs of the reference; and in 17 Enc. Plead. & Prac. 1089, it is said: "As an item of expense in a suit in equity the master's fee is included in the general costs of the suit." And in Bradley *v.* West Chester St. R. Co., 160 Pa. St. 72, it was so held. In an equitable action it is the province of the judge to determine upon whom costs shall fall; and this determination will not be reversed, unless the discretion of the judge is abused. Civil Code, §4850; *Fricker* v. *Americus Improvement Co.*, 124 *Ga.* 165 (52 S. E. 65). Civil Code, §4602, provides: "The fees of the auditor shall be taxed by the judge, and shall be as follows:" The section then goes on to prescribe rules for determining the amount that the auditor shall be allowed for his services, and provides that the total fees for all services rendered shall not exceed one thousand dollars. Prior to the act of December 18, 1894 (Acts 1894, p. 123), codified in Civil Code, §§4581-4603, all fees of a master in chancery were determined by the presiding judge, who had the power to tax them as costs against either party, or to apportion them between the parties to the cause. Code of 1882, §3097(e). In *Moore* v. *Dickenson*, 117 *Ga.* 887 (45 S. E. 241), it was held that the act of 1894 repealed all existing laws in reference to auditors and masters, and provided (Civil Code, §4602) that the fees of the auditor should be taxed by the judge. In that case it was also held that the judge, in his discretion, might apportion the fee between the parties to the suit. Construing the language of the Civil Code, §4850, giving the judge in equitable actions the power, in his discretion, to tax all the costs upon either party, in connection with §4602, giving the judge the power to tax the fees of the auditor, which, as we have said, are in the nature of costs of the reference, we think it is plain that the judge may, in his discretion, adjudge all of the auditor's fee to be paid by either party; and his discretion in the matter will not be controlled, unless it be abused.

*Judgment affirmed on main bill of exceptions; cross-bill dismissed.*

*All the Justices concur, except Holden, J., disqualified.*