(75 South. 387)

HENDERSON v. GARNER. (4 Div. 667.)

(Supreme Court of Alabama. April 19, 1917.)

1. BANKRUPTCY ⬤⇒302(1)—TRUSTEE'S ACTION TO SET ASIDE CONVEYANCES—COMPLAINT—CONSTRUCTION.

A bill alleging that stock of a corporation was mainly paid for by stock-worn merchandise at inflated values turned over to it by the stockholders in payment of their stock, and that only a small portion of the capital stock issued was paid for in cash, did not indicate that the bill was filed for the purpose of collecting any unpaid subscription, but, taken with the allegations of the insolvency of the corporation, the bill was plainly for the purpose of setting aside transfers of property both real and personal by the corporation to the defendant, one or its directors, as in fraud of rights of creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 456.]

2. BANKRUPTCY ⬤⇒175—POWER OF TRUSTEE.

The trustee in bankruptcy of a corporation was entitled to maintain a bill to set aside transfers of property by the corporation to one of its directors as in fraud of its creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248.]

3. COURTS ⬤⇒92 — DECISIONS OF OTHER COURTS AS CONTROLLING.

The fact that a court in passing on a case of limited facts uses particular and comprehensive language does not render that case authority for a doctrine broader than its facts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 335.]

4. CORPORATIONS ⬤⇒542(3)—RIGHT OF CORPORATION TO PURCHASE ITS OWN STOCK.

Transfers of property made by a corporation to one of its directors as consideration for the purchase of its stock held by him at a time when the corporation was insolvent, the amount of property transferred being nearly one-half of the assets of the corporation, were but gifts to the director, and therefore fraudulent in law and void, without regard to the question of intent.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2156.]

5. CORPORATIONS ⬤⇒542(3)—TRANSFERS BETWEEN DIRECTOR AND CORPORATION—PRESUMPTION.

Where a stockholder and director of a corporation transferred his stock to the corpora-

tion in exchange for corporate property, the stockholder, as a director of the corporation, will be presumed to have known that the corporation was insolvent, and it would be against public policy to permit him to plead his ignorance and profit by his own want of knowledge when it was his duty to know.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2156.]

Appeal from Chancery Court, Dale County; Oscar S. Lewis, Chancellor.

Action by W. S. Garner, trustee in bankruptcy, against J. C. Henderson. From a decree overruling demurrers to the bill, the defendant appeals. Affirmed.

The bill in this cause shows that the Ariton Mercantile Company, a domestic corporation, on October 7, 1915, executed a deed of assignment for the benefit, of creditors. and that on October 8, 1915, petition was filed by certain creditors in involuntary bankruptcy in the District Court of the United States at Dothan, Ala., and that on October 30, 1915, said corporation was duly adjudged a bankrupt by said court, and W. S. Garner duly appointed as trustee in bankruptcy of said estate, qualified as such, and entered upon the discharge of his duties as such trustee, and that said court before the filing of this bill entered an order authorizing said trustee to prosecute this suit, which was done on behalf of said bankrupt, its estate, and its creditors.

The bill further shows:

That on April 3, 1906, said Ariton Mercantile Company was incorporated under the laws of Alabama for the purpose of carrying on the mercantile business, borrowing and lending money, buying and selling property, etc., with its principal office at Ariton, in Dale county, Ala., with an authorized capital stock of $12,500, divided into 125 shares of $100 each, beginning business with a capital of $3,100. That its stock was originally subscribed for as follows: W. C. Windham, 65 shares; J. C. Barnes, 20 shares; J. C. Henderson, respondent in this cause, 20 shares; and E. R. Phillips, 20 shares. That each shareholder was elected a director of the corporation, with W. C. Windham as its president and general manager, and J. C. Barnes as secretary and treasurer, and, as thus organized, entered into business. That said Windham, Henderson, Barnes, and Phillips continued to act as directors of said corporation and to conduct its affairs as directors until January 6, 1913, when said directors of said corporation pretended to purchase from said J. C. Barnes for treasury stock "the said 20 shares of the capital stock of said corporation owned by said J. C. Barnes as aforesaid, and he, the said J. C. Barnes, pretended to cease to be a stockholder in and director of said corporation, but that the said W. C. Windham, E. R. Phillips, and J. C. Henderson continued to act as directors of said corporation and to conduct its affairs as such until, to wit, the 19th day of February, 1913, when two of its directors, said W. C. Windham and E. R. Phillips, pretended for it to purchase the shares of capital stock of said J. C. Henderson in said corporation as treasury stock, as will be set forth more in detail hereafter, and he, the J. C. Henderson, pretended that he cease to be a stockholder in and a director of said corporation.

"Orator avers that after said corporation had been engaged in business for about a year it did,

on, to wit, the 1st day of January, 1907, increase its capital stock to $24,000, issuing to said J. C. Henderson 80 additional shares of the par value of $100 each, to Schloss & Kahn, Montgomery, Ala., 5 shares of the par value of $100 each, and the said W. C. Windham 35 shares of the par value of $100 each, thus absorbing the $11,500 increase in capital stock, and thus making the said J. C. Henderson to hold all 100 shares of the par value of $100, aggregating $10,000 of said capital stock.

"Orator avers that the said incorporation never had in fact much in market value paid upon the subscriptions to and for its capital stock issued to its said stockholders; that, as orator was informed and believes, and upon such information and belief states and charges the fact to be, the said capital stock was mainly paid for by ragged remnants of stock-worn merchandise at largely inflated values turned over to it by the stockholders in payment of their stock, with only a small portion and percentage of the capital stock issued by it paid for in cash, in consequence whereof and in connection with bad management of its affairs otherwise it was from the beginning financially crippled and labored under disadvantages financially, and from a short time after its organization it became indebted in large sums to divers persons, which continued to increase in number and amounts until on the said 19th day of February, 1913, it owed between $60,000 and $100,000 to a vast number of creditors scattered about the country; that among these creditors were the National Park Bank of New York City, N. Y., to which it owed from $10,000 to $20,000, the Farmers' & Merchants' Bank of Troy, Ala., to which it owed from $5,000 to $10,000, the Ariton Fertilizer Company of Ariton, Ala., to which it owed about $20,000, to the Ariton Banking Company, to which it owed about $8,000 to $10,000, and a vast number of mercantile and divers and miscellaneous creditors, while at that time the total market value of all its assets was far less than $40,000, so that its capital stock was worthless, and it was insolvent. Orator avers that said corporation had been insolvent for a long time before the said pretended sale to it by said J. C. Henderson of his said capital stock, and that its assets and estate were, on said 19th day of February, 1913, and had been for a long time prior thereto, a trust estate and fund and the said J. C. Henderson, as one of its said directors, did jointly with its other directors, and for a long time prior thereto had jointly with them controlled said estate and assets as a trust fund for the benefit of said corporation, or was in duty bound so to control them.

"Third. That on, to wit, said 19th day of February, 1913, two of said directors, viz. said W. C. Windham and said E. R. Phillips, met as such in said Ariton and made entries upon the minutes of said corporation in words and figures as follows: 'Record of a called meeting of the directors of the Ariton Mercantile Company held at Ariton, Ala., on the 19th day of February, 1913, at 10 o'clock a. m. Directors present: W. C. Windham and E. R. Phillips. The above constituting a quorum of directors, on motion duly made and carried, W. C. Windham was made chairman of the meeting, and E. R. Phillips, secretary. It is ordered that this company do buy for its treasury the stock of J. C. Henderson as a stockholder herein and pay him therefor the sum of $15,984 on January 1, 1914; and in consideration of a transfer to this company by said J. C. Henderson of his entire interest as such stockholder herein this company shall execute by its president its note to said J. C. Henderson, due January 1, 1914, for said sum of $15,984, and to secure the same shall transfer to said J. C. Henderson its 76 shares of stock in the Ariton Banking Company and its 39 shares of stock in the Ariton Fertilizer Company, and shall execute to said J. C. Henderson

by its president a mortgage on all its real estate, and W. C. Windham, president of the company, is hereby authorized to execute on behalf of this company the note and mortgage of said company to the said J. C. Henderson, above mentioned, attach the seal of this company thereto, and also transfer to said J. C. Henderson, as security for said debt, said stock in said Ariton Banking Company and in said Ariton Fertilizer Company, and include said stock in said mortgage. There being no further business, upon motion duly made and carried, the meeting adjourned. W. C. Windham, Chairman. E. R. Phillips, Secretary.'

"Orator avers that no meeting of the stockholders of said corporation was held at which any vote or action was taken upon or any authority given to said two directors to make said entries upon the said minutes of the said corporation, and that as such directors they were wholly without authority or right to make the same; that they did not constitute a quorum or majority of the directors of said corporation; that its by-laws require four directors, and no action by said corporation was ever taken authorizing less than four directors prior to said 13th day of February, 1913, or on that day, and two of them was not a majority or quorum of the four required by the by-laws of said corporation to act in such matters as those appearing on said minutes and copied hereinabove; and that the said two directors neither had any authority from any action of the stockholders taken as such in any meeting of them nor were they a sufficient number of directors to act as such and bind the corporation in the matters and things entered by them on said minutes as aforesaid. Yet orator avers that, pursuant to the directions given by said order of said two directors, said corporation, acting by its president, said W. C. Windham, pretended to receive from said J. C. Henderson his said 100 shares of its capital stock at the purchase price of $15,984, to be held by it as treasury stock, and in consideration thereof executed the note of said corporation to said J. C. Henderson for said $15,984, due January 1, 1914; and, further, to secure the same transferred to said J. C. Henderson the 76 shares belonging to said Ariton Mercantile Company of the capital stock of the Ariton Banking Company and its 39 shares of the capital stock of the Ariton Fertilizer Company, each of the par and the market value of $100 a share, and also executed to said J. C. Henderson a mortgage upon all its real estate, consisting of and comprising its storehouse and lot, warehouse and lot, stables and lot, and dwelling house and lot, all known as the Ariton Mercantile Company property, situated in the town of Ariton, in Dale county, Ala., and orator avers that said stock and said real estate was at the time of the aggregate market value of about $18,000, and was nearly or quite one-half of all the estate and assets at the time belonging to said corporation, Ariton Mercantile Company. Orator further avers that at the annual stockholders' meeting of said Ariton Mercantile Company held on the 1st day of July, 1913, there was an election of directors of said corporation, and said W. C. Windham, said E. R. Phillips, and one E. K. Windham, who had in the meantime become a stockholder in said corporation, were elected its directors; that thereafter, on, to wit, the 6th day of March, 1914, said last-named directors held a call meeting of their board at Ariton, Ala., at which meeting they caused the following entries to be made and entered upon the minutes of said corporation: 'Record of call meeting of the directors of the Ariton Mercantile Company, held at Ariton, Ala., on the 6th day of March, 1914, at 7:30 o'clock, p. m. At a meeting of the directors of the Ariton Mercantile Company at its storehouse in Ariton, Ala., there being present W. C. Windham, E. R. Phillips, and E. K. Wind-

ham, being all the directors of said company, on this the 6th day of March, 1914, it is ordered that, for and in consideration of $15,984, the president and secretary of this company sell and convey to J. C. Henderson, by warranty deed of conveyance, the brick storehouse, stables, and warehouse lots and dwelling house and lot belonging to this company, and all situated in Ariton, Ala. It is further ordered that the seal of this company be attached to said deed of conveyance, the same being in foreclosure of the mortgage held by said J. C. Henderson upon said property, that also the president of this company for same consideration sell, transfer, and convey unto the said J. C. Henderson 50 shares of the paid-up capital stock held by said company in the Ariton Banking Company, and that said transfer be made upon the books of said banking company, and that a certificate of stock therefor be issued by said banking company to said J. C. Henderson. [Signed] W. C. Windham, President and General Manager. E. R. Phillips, Vice President and Assistant Manager.'

"Orator avers that shortly thereafter the said corporation, acting through its president, said W. C. Windham, and its secretary, said E. K. Windham, conveyed to said J. C. Henderson its brick storehouse and lot, stables and lot, warehouse and lot, and dwelling house and lot, in pretended foreclosure of said mortgages, and transferred and conveyed unto said J. C. Henderson the said shares of capital stock in said banking company. Orator avers that the said Ariton Mercantile Company, being so insolvent on said 19th day of February 1913, was without the legal and equitable right to purchase said stock of said J. C. Henderson, to be held by it as treasury stock, and that its said directors were without authority in law to order the purchase thereof for said purpose, and that said corporation was without the right in law to sell to said J. C. Henderson the said shares of capital stock in said banking company, or the said shares of capital stock in said fertilizer company, or the said real estate or any part thereof, and that said directors were without the authority in law to order the same or any part thereof sold to him in payment for his said capital stock, and that said president and secretary either or both of them were without authority in law to convey to said J. C. Henderson either the said shares of capital stock in said banking company and in said fertilizer company or said real estate or any part thereof, and orator avers that the attempt by said corporation and its said officers to convey its said property, real and personal, as aforesaid, to said J. C. Henderson, was void and did not operate to pass the title to him. Orator avers, however, that upon the face of the record and as the matters appear thereon the said title does pass to said J. C. Henderson to said property. He avers, however, that if he is mistaken in his allegation that the title to said property or any part thereof did not pass to said J. C. Henderson by said conveyances or any of them, that the parties thereto intended thereby to do so, and did in fact thereby hinder, delay, and defraud the said creditors of said Ariton Mercantile Company, most of whom it still owes the debts then owing by it to them. Orator further avers that the sale by said J. C. Henderson of his said capital stock therein to said Ariton Mercantile Company and the taking over by him of the said real and personal property in consideration of his surrender to it of his said capital stock was in breach of his duty as trustee, as aforesaid, in consequence whereof orator avers that he took and held and holds so much as he yet does hold of said property as trustee de son tort and ex mal officio, with resultant duty fastened and resting upon him as such trustee to account in this proceeding to orator as trustee in bankruptcy of said Ariton Mercantile Company, as hereinafter appears, for all of said property, real and personal, and for all the rents, incomes, profits, usufructs, interest, dividends, and benefits received or which he, if he had cared for said property as in duty bound to do, he would have received therefrom from the time he received the same till now and till he shall finally account therefor in this proceeding, and that whether the said title to said property passed to him or not by said attempted or pretended or de facto conveyances and transfers to him, in either event he as such trustee de son tort and ex mal officio is in equity and duty bound in this proceeding so to account. Orator avers that said real estate has a large rental value, viz. $1,000 a year and upwards, and that the said capital stock has been paying large dividends, viz. 10 cents on the dollar of par value a year or more, and that said J. C. Henderson has received said rents and dividends annually ever since said property was so transferred and conveyed to him, and that he has said real estate now rented or leased upon contracts which provide for him to receive like and greater sums therefrom this year.

"Fourth. Orator avers that said Ariton Mercantile Company, being insolvent, as aforesaid, continued to be so insolvent until and including the 7th day of October, 1915, when there was held a meeting of its stockholders in Ariton, Ala., at which meeting said stockholders caused to be entered upon the minutes of said corporation the following: 'At a meeting of the stockholders of the Ariton Mercantile Company on this the 7th day of October, 1915, there being present W. C. Windham, E. R. Phillips, Sr., and E. K. Windham, it is ordered that the president of this company execute to Fox Henderson a deed of assignment in trust conveying all the property of this company for the equal benefit of all creditors, subject to existing priorities. W. C. Windham, President. E. R. Phillips, Secretary. E. K. Windham. Witness: M. W. Thornton.'

"Orator avers that said order was passed as indicated therein directing said assignment to said Fox Henderson therein named. Orator avers that, pursuant to said order of said stockholders, said W. C. Windham, as president of said corporation, executed said assignment to said Fox Henderson, and that thereafter, on the 8th day of October, 1915, a petition in involuntary bankruptcy was filed by certain of the creditors of said corporation."

Paragraph 6 of the bill avers the employment of attorneys to prosecute the suit, and seeks to have their charges for services allowed as a charge against the fund involved in the suit out of the proceeds recovered.

In the prayer of the bill a reference is sought to ascertain the value of the property conveyed to said J. C. Henderson, the amount of rents, dividends, interest, and benefits received by him since he acquired the same, what waste, if any, he has committed, an accurate description of the property conveyed to said Henderson, and what is a reasonable attorney's fee for services. The said prayer continues as follows:

"That said J. C. Henderson be required to account in all said matters referred to said register, and be charged as trustee, as aforesaid, for all rents, dividends, interests, and benefits which either he has received from said property so received by him or any portion thereof, or which he would have received if he had cared for and managed the property as he should have done; that if he has disposed of the property or any portion thereof, or has allowed the same to become injured, or has committed any waste

or devastavit as to said property or any portion thereof, that he be required to account for so much thereof as he has parted with and for such waste, injury, or devastavit as he has committed or has allowed; that personal judgment be rendered against him, in all said matters wherein such judgment may be or become necessary to the doing of complete equity in the premises; that he be adjudged to have received said property as trustee de son tort and ex mal officio, and as such held to a strict account in the premises to your orator in all said matters; that all said property so received by said J. C. Henderson which he has not disposed of and which is now under his control be sold under the orders of this court and converted into money, to the end that orator, as said trustee, may apply the same as in equity he should do; and for such other and further relief, general and special, as unto your honor may seem meet and proper; also that all title to any and all of said property so received by said J. C. Henderson from Ariton Mercantile Company, if any title to any of it passed to him by virtue of the matters herein alleged, be by this court divested out of him and invested in orator as said trustee."

There were numerous assignments of demurrers to the bill, among them that it does not appear that any fraud was committed by the respondent on the creditors of the Ariton Mercantile Company, and that it does not appear that the conveyances were made by the Ariton Mercantile Company to respondent with actual fraudulent intent, or with the purpose of hindering, delaying, or defrauding the creditors. Another assignment of demurrer takes the point that the bill does not show that the respondent had knowledge of the insolvent condition of said mercantile company at the time of making said property or said conveyance, nor that he had notice of the alleged insolvent condition of said Ariton Mercantile Company at that time.

These were the assignments of error treated by the court as the ones having been argued by counsel for appellant. The demurrers were overruled, and from this decree the respondent prosecutes this appeal.

W. R. Chapman, of Dothan, for appellant. Sollie & Sollie, of Ozark, for appellee.

GARDNER, J. [1] While the bill avers that the capital stock of the Ariton Mercantile Company was "mainly paid for by ragged remnants of stock-worn merchandise at largely inflated values, turned over to it by the stockholders in payment of their stock, with only a small portion * * * of the capital stock issued by it paid for in cash," yet these averments were but thrown in, as we construe the bill, as a mere premise to the allegations which follow as to the insolvency of the said corporation. This, we think, very clearly appears from the following language used in the immediate connection with the above:

"In consequence whereof, and in connection with bad management of its affairs otherwise, it was from the beginning financially crippled, and labored under disadvantages financially."

The bill does not seek and was not filed for the purpose of collecting any unpaid subscription to the capital stock, but, as we construe it, was filed for the purpose of having set aside transfers of property, both real estate and personalty, by said corporation to the respondent, one of the directors thereof, as in fraud of the rights of creditors.

[2] That the complainant as trustee in bankruptcy may maintain the bill is, of course, clear and unquestioned. Sherrill v. Hutson, 187 Ala. 189, 65 South. 538.

The right of a corporation to use its assets in the purchase of its capital stock, or any part thereof, has been the subject of much discussion, which has resulted in a great diversity of opinion, as will be noted from an examination of the authorities found cited in the notes to the following cases. Hall v. Henderson, 126 Ala. 449, 28 South. 531, 61 L. R. A. 621, 85 Am. St. Rep. 53; Schulte v. Boulevard Gardens Land Co., 164 Cal. 464, 129 Pac. 582, 44 L. R. A. (N. S.) 156, Ann. Cas. 1914B, 1013; Fitzpatrick v. McGregor, 133 Ga. 332, 65 S. E. 859, 25 L. R. A. (N. S.) 50; Atlanta & Walworth, etc., Ass'n v. Smith, 141 Wis. 377, 123 N. W. 106, 32 L. R. A. (N. S.) 137, 135 Am. St. Rep. 42; Draper v. Blackwell & Keith, 138 Ala. 182, 35 South. 110; Dacovich v. Canizas, 152 Ala. 287, 44 South. 473; Glenn v. Hatchett, 91 Ala. 316, 8 South. 656.

[3] The author of the note to the case of Hall v. Henderson, 61 L. R. A. 621, supra, after an examination of the numerous authorities on this question, set out in his introductory remarks the following observations which are of interest in this connection:

"The courts of this country are divided on the question involved in this note. In some of the jurisdictions they hold that a corporation, unless forbidden by statute, may purchase its own shares of stock without an express or implied statutory grant of power. In other states the existence of such power is denied. The English authorities are also against the recognition of such a corporate power. It will be noted, however, that both sides of the controversy recognize the existence of exceptions to their particular doctrine. The rule that corporations have this power is universally accepted as subject to the condition that the transaction must be free from fraud, and not prejudicial to the rights of stockholders or creditors. On the other hand, the courts which deny the existence of this power concede the validity of such a transaction, where it is made in good faith to prevent the loss of an indebtedness due the corporation.

"The existence of these exceptions to the general rules necessitates a somewhat detailed presentation of the facts of each case; for, if these exceptions exist, others may be recognized by the courts whenever a suitable case arises. It will be noted that in many of the cases sustaining this corporate power the court, while laying down a broad, comprehensive rule, in fact shows an intention to limit its application by calling attention to the particular facts involved which justify the application. It will also be noted that the discussion has been somewhat confused by the fact that the cases which only pass on the right of a corporation to take its shares in payment of a debt, or under particular statutory authority, have been cited in support of the broad proposition that the general right to purchase exists. As said in a case arising in Illinois a state which recognizes the existence of the broad corporate power to purchase, each case

must depend upon, and be determined by, its own circumstances. Fraser v. Ritchie, 8 Ill. App. 559.

"The fact that the court, in passing on a case of limited facts, uses broad and comprehensive language, does not render that case authority for a doctrine broader than its facts. The tendency of the courts to attempt to enunciate rules broader than the facts of the particular cases they are passing upon has so manifested itself in the cases presented here that it may not be out of place to refer to the maxim expounded by Chief Justice Marshall in Cohens v. Virginia, 6 Wheat. 399, 5 L. Ed. 290: 'It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.'"

We therefore find no necessity for a review of all the authorities upon this question or an expression or indication of opinion in regard to situations and conditions not presented by the present record, but we prefer to confine ourselves to the facts as set forth in the bill before us, and to a decision as to the sufficiency of the bill thus presented.

[4] The bill alleges that at the time of the sale of the stock by the corporation to the respondent the capital stock was worthless and the corporation was insolvent, and had been so for a long time prior to said sale, and that the value of the property conveyed was the sum of, to wit, $18,000, which was nearly one-half of all the estate and assets at the time belonging to said corporation, and it is not argued in brief by counsel for appellee that the averments as to insolvency are not sufficient. By virtue of our statute (section 3509, Code 1907) the assets of insolvent corporations constitute a trust fund for the benefit of creditors, and as said by this court in Warren v. Kilgroe, 176 Ala. 476, 58 South. 432, "it is not now important or desirable to take account" of those cases cited therein which treated the question as to the trust character of the assets of a corporation prior to the passage of the act now embodied in the above-noted section.

After reviewing several of the authorities bearing upon the question of the purchase by a corporation of its capital stock, the Supreme Court of Georgia in Fitzpatrick v. McGregor, supra, used the following expression, which we quote with approval:

"We know of no case wherein it is held that an insolvent corporation has the power to purchase its own shares of stock. Without regard as to what is the sounder view as to the power of a corporation, in the absence of statutory prohibition, to purchase its own stock, it must certainly be true that, if the corporation, at the time of making such purchase, is in an insolvent condition, and therefore the purchase is to the prejudice of its creditors by diminishing their chances of collecting their claims, the transaction cannot be sustained, and the selling stockholder who thus receives a portion of the capital holds the same subject to the superior equities of creditors."

Indeed, very similar observations were made by this court in Hall & Farley v. Henderson, 126 Ala. 449, 28 South. 531, 61 L. R. A. 621, 85 Am. St. Rep. 53, where it was said:

"We are aware that the courts of this country are divided upon the question as to the power of corporations to acquire and hold its own stock. But in no jurisdiction is the power of a corporation to purchase its own shares sustained, if the purchase is made with the intent to injure its creditors or to defeat them in the collection of their claims or if it has such effect."

The bill further discloses that the corporation still owes a majority of the creditors to whom it was indebted at the time of the transaction here complained of, and that the assets of the bankrupt estate when sold produced less than $4,000, and that after applying all the assets belonging to it at the time it was put into bankruptcy (aside from the property here involved) there will remain upwards of $40,000 of unpaid indebtedness owing from said bankrupt to its said creditors of debts, most of which it owed them when said transfer and conveyances were made.

In the case of Sherrill v. Hutson, supra, the following language from the case of Hall v. Ala. T. Co., 143 Ala. 464, 39 South. 285, 2 L. R. A. (N. S.) 130, 5 Ann. Cas. 363, in reference to a purchase by a corporation of shares of its capital stock, was quoted:

"Such a diversion of corporate property is, in respect of creditors, essentially a gift to the shareholders whose shares are purchased by the company, a purely voluntary transfer of corporate assets in fraud of corporate creditors, fraudulent and void as to creditors, and this regardless of the intention actuating the company and the selling shareholders."

The complainant in this cause, as trustee of the bankrupt estate in this proceeding, represents more particularly the creditors of said estate, many of whom, as disclosed by the averments of the bill, were existing creditors of said corporation at the time of the transfers here complained of, and the insolvency of the corporation at that time, as previously stated, is also averred. The excerpt from the opinion of Hall & Farley v. Henderson, supra, shows that the transfers made to the respondent in consideration of the purchase by the corporation of the stock were but gifts to the respondent, and therefore fraudulent at law, and void without regard to the question of intent.

[5] The assignment of demurrer, therefore, taking this point was properly overruled. It is next insisted, however, by counsel for appellant, that the transaction would not be declared fraudulent and void as to creditors unless it also appeared that the respondent had knowledge or notice of the insolvent condition of the corporation at the time the

transaction was entered into. The respondent was shown by the bill to have been one of the directors of the corporation from the time of its incorporation to the date of said purchase, the bill alleging "that the said W. C. Windham, E. R. Phillips, and J. C. Henderson continue to act as directors of said corporation, and to conduct its affairs as such, until, to wit, the 19th day of February, 1913," the date of the original purchase of stock by the corporation from said respondent.

This question was also given consideration in the case of Hall & Farley v. Henderson, supra, where in 126 Ala. on page 493, 28 South. on page 543 (61 L. R. A. 621, 85 Am. St. Rep. 53), in the opinion, the following from Thompson on Corporations was quoted with approval:

"It is a sound view, at least in so far as the question respects the rights of third parties, that the directors of a corporation are in law conclusively presumed to know its condition, its business, its receipts and expenditures, and all the general facts which go to make up that condition and business, as shown by the entries on its regular books. The reason for this is that it is their duty to know these things in the exercise of their official functions. This doctrine is said to be one founded in public policy, essential to the safety of third parties in their dealings with corporations, and to the protection of the stockholders interested in the welfare and safe management of corporations."

See, also, 2 Thomp. on Corp. (2d Ed.) § 2034, and note, wherein are cited German Sav. Bank v. Wulfekuhler, 19 Kan. 60, and Falloon v. Schilling, 29 Kan. 292, 44 Am. Rep. 642.

In the case of German Sav. Bk. v. Wulfekuhler, supra, speaking to the question, the court said:

"He cannot now, as against the interests of the bank and its stockholders, and perhaps its creditors, be allowed to plead ignorance and innocence, and thereby profit by his own want of knowledge and by his own failure to do his duty as an officer of the bank. Such would be against both morals and law. Of course, we do not hold that a director is bound to know everything that transpires in a bank, and at the very time when it occurs. But we do hold that a director, having personal and private dealings with his bank, is bound to know (so far as the same affects his said personal dealings) the general condition and management of his bank and everything of importance that occurs therein either at the time it occurs or soon thereafter."

It is quite clear, therefore, from our own authorities that a director of a corporation will be presumed to know the conditions of the corporation when personal transactions of this character are being had by him with the corporation, and that it would be against public policy to permit him to thus plead his ignorance and profit by his own want of knowledge when it was his duty to know.

We have here treated the questions discussed by counsel for appellant in his brief, and conclude that the insistence here made is without merit.

It results that the decree of the chancery court will be here affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., concur.