[No. 8186.]

UNITED SECURITIES COMPANY V. OSTENBERG.

1. BANK—*Purchase of Its Own Stock.* A bank is not permitted to purchase its own stock. One who transfers to a bank, shares therein, receiving funds of the bank, with knowledge of their character, holds such funds subject to the right of the bank's creditors. It is immaterial whether the party transfers his own shares or those of another. (256.)

2. —— *Officer of the Bank Participating* in such a transaction is liable, without reference to the ownership of the shares. (257.)

3. —— *Sham Resignation of Officer.* A resignation tendered before the transfer is made, or even agreed upon, merely for the purpose of effecting an apparent change in the officer's relation with the bank, and notwithstanding which the officer enters the transaction in the books of the bank, is without effect to relieve him of liability. (257.)

4. —— *Ratification.* The directors of a bank consenting to an illegal appropriation of its funds cannot ratify the transaction as against creditors. (257.)

Nor does the mere silence of the stockholders who are ignorant of the transaction constitute ratification. (258.)

5. —— *Receiver—Authority.* The receiver of an insolvent bank is authorized to sell, under the direction of the court, a right of action which the bank has for funds thereof unlawfully appropriated. (258, 259.)

The assignee is entitled to maintain an action upon such assignment, against the culpable parties. (259.)

6. ASSIGNMENT—*What Assignable.* The right of a bank to recover its funds which have been unlawfully appropriated is a chose in action, and may be effectually assigned. (258.)

*Error to Denver District Court.* Hon. JAMES H. TELLER, Judge.

Mr. T. J. O'DONNELL, Mr. J. W. GRAHAM, and Mr. CANTON O'DONNELL, for plaintiff in error.

Mr. H. RIDDELL, for defendant in error.

The complaint filed by the United Securities Company declared upon three causes of action. The first alleged that the Colorado State Bank of Durango was a banking corporation organized under the laws of the state of Colorado; that on October 17th, 1906, Ostenberg was its cashier; that on that date he drew drafts aggregating nine thousand three hundred dollars upon correspondents of the bank in favor of M. E. Ostenberg, his wife, which he procured W. C. Chapman, vice-president of the bank, to sign; that thereafter he collected these drafts; that the drafts were without consideration, which was well known to the defendant; that he has not repaid the bank for the drafts so obtained, and that prior to the commencement of the action the bank assigned to plaintiff its right and cause of action on account of the transaction as above narrated.

For a second cause of action it was alleged that on the date above mentioned the defendant drew a cashier's check for three hundred dollars in favor of his wife, which he procured Chapman as vice-president to sign; that this draft was endorsed by the payee, whereby the defendant obtained from the bank the sum for which the check was drawn; that this check was without consideration which defendant well knew; that he has not repaid the bank the amount so obtained, and that prior to the commencement of the action the bank assigned to plaintiff all its right, title and interest against defendant growing out of the transaction.

For a third cause of action it was charged that on the date before stated, Ostenberg was indebted to the bank in the sum of $1,252.76 upon an overdraft for sums which he had at divers times received and taken from the bank, and charged to his account; that he has not paid this sum to the bank nor any part thereof, and that prior to the commencement of this action the bank assigned to plaintiff its right and cause of action against defendant on account of the overdraft.

For answer to the first cause of action the defendant admitted that on the 17th day of October, 1906, he was the cashier of the bank; that on that date his wife, M. E. Ostenberg, was the owner of one hundred and two shares of the capital stock of the bank; alleged that through him his wife negotiated and agreed to sell her stock to one Frank Eldredge, a director, and W. C. Chapman, vice-president of the bank, who were then and there dealing for themselves, or one Freeman; that Eldredge and Chapman agreed to pay for the stock in cash or its equivalent; that the manner of making the payment, chosen by the purchasers, with his consent, was by means of the drafts mentioned in the first cause of action; that before these drafts were drawn he resigned as cashier; that at the request of the purchasers he wrote the drafts; admits they were paid by the drawees; states that he does not know what consideration passed be-

tween the bank and Chapman for the drafts, and that so far as concerns his wife the drafts were the consideration, in part, passing to her for the purchase of her stock.

The answer to the second cause of action, so far as material to the action, is in effect the same as to the first, and, in addition states, relative to the cashier's check, that the bank was indebted to him for services; that the amount due for these services was adjusted, and as part consideration for the sale of the stock by his wife, he accepted for her the cashier's check mentioned in the second cause of action.

For answer to the third cause of action he admits he received the money as stated; alleges the bank was indebted to him for services as cashier; that he resigned that position, and that the amount due him for services was adjusted with the bank, by which it was agreed that the amount of his overdraft should be offset against the amount due him for services.

The replication to the answer to the first cause of action denies that M. E. Ostenberg, through defendant, negotiated or agreed to sell her stock to Eldredge or Chapman or either of them, or that they were dealing for themselves or for Freeman. It further alleged, in substance, that when the drafts were signed and delivered the defendant knew that Chapman and Eldredge and neither of them had money in the bank at the time the drafts were drawn; that neither of these parties intended to reimburse the bank therefor; that the funds against which the drafts were drawn were the funds of the bank, and that it was intended and understood by the defendant that the drafts were to be paid out of the funds of the bank.

The replication to the answer to the second cause of action is substantially the same as to the first, varied to meet the facts involved.

The replication to the answer to the third cause of action denies that the bank was indebted to plaintiff for services, and that there was any settlement for such services.

The plaintiff also filed a replication to the several defenses which in effect pleads evidence material to the issues made by the pleadings as above stated in substance. The trial of the cause resulted in a judgment for defendant, and plaintiff brings the case to this court on error.

From the testimony it appears that in May, 1905, Freeman and Ostenberg entered into a contract by which the latter agreed to purchase one hundred shares of the stock of the bank. For this stock he paid ten thousand dollars, and was appointed cashier of the institution; that he became dissatisfied with the financial condition of the bank, and also for the reason that the stock he purchased had belonged to Freeman, instead of a brother of the latter, as he supposed; that he transferred ninety-five shares of his stock to his wife; that later Ostenberg and Freeman purchased four shares from another party, two shares being put in the name of Mrs. Ostenberg. Freeman, Ostenberg, Chapman, and Eldredge, with two other parties, constituted the board of directors of the bank; that Ostenberg claimed he was to have an increase in salary which was not allowed; that this caused friction between himself and Freeman, and in the early part of October, 1906, he demanded that Freeman repay him the money he paid for his stock, the claim made on behalf of Ostenberg being that under certain conditions Freeman was to re-purchase his stock. There is testimony to the effect that Ostenberg stated to Freeman and other directors that unless he was repaid for his stock he would circulate reports which would cause a run on the bank, and break the institution. Freeman, Eldredge and Chapman each testify that statements of this character were made, but Ostenberg denies making such threats.

Freeman, president of the bank, Chapman, Eldredge and Ostenberg had one or more meetings, the object of which was to devise some plan to purchase the Ostenberg stock, and get rid of him. The plan agreed upon in order to obtain the cash, or its equivalent, was to draw drafts upon banks

in which the Durango State Bank carried deposits, and cancel an overdraft of Ostenberg. He was a party to this arrangement. On the evening of October 17th, 1906, Chapman, Eldredge and Ostenberg met at the bank. Drafts were drawn on correspondents of the bank in the sum of ninety-three hundred dollars, and a cashier's check for three hundred dollars, all of which were in the handwriting of Ostenberg; and signed by Chapman as vice-president, and delivered to Ostenberg, who turned over or left in the bank the certificates of stock standing in his name, and the name of his wife, endorsed in blank. At the same time he tendered in writing his resignation as cashier, although he testified that this tender was made before the drafts and cashier's check were drawn. It had not been acted upon, however, at either of these times. He seems to have treated the transaction as a personal one, as the drafts were endorsed by his wife, and by him deposited to his credit in other banks in which he was interested. He deposited the cashier's check to his credit in the Durango State Bank, and checked against it for current expenses. It is conceded that he did not repay the bank for the drafts or check. Neither is it claimed that any one reimbursed the bank for the funds thus taken. No such defense is interposed. In fact when plaintiff sought to show by Chapman that he did not reimburse the bank on account of the drafts and check, defendant objected and the objection was sustained. Regarding the overdraft, Ostenberg testified in substance that it was cancelled after allowing him as a credit thereon the sum of eighty-five dollars as salary up to October 17th. This cancellation, according to Ostenberg, constituted part of the consideration for the sale of the stock, for which he was to receive in all the sum of ten thousand six hundred dollars, although the amount of the overdraft, for which he claims to have received credit in connection with the drafts and check, was between one hundred and two hundred dollars more than this sum. He obtained credit on the books of the bank for the overdraft,

by means of a deposit slip he made out, which item, and the items represented by the drafts and check were entered by him in the "sundry cash book." He claims the stock was sold to Chapman and Eldredge, but we think it is clear from the testimony that this is not the fact. On the contrary the evidence establishes that it was sold to the bank, or at least was purchased for its benefit. The conversations between the parties, and the method adopted to pay him for it show beyond question that the stock was purchased with the funds of the bank, but not for any individual; that Ostenberg knew this, and also knew that Chapman and Eldredge were not the purchasers.

Under date of December 12th, 1907, there appears on the books of the bank under the head of judgments, claims, etc., a charge of $10,747.76, against Ostenberg, which represents the drafts, cashier's check and his overdraft, less the $85.00 credit allowed. Freeman, however, testifies that the entry as a matter of fact was originally made on the 12th day of November, 1906, and he treated it as the actual amount paid Ostenberg for the stock.

On December 18th, 1907, in an action instituted by the State Bank Commissioner, a receiver for the bank was appointed. As part of the assets of the bank he scheduled the claim against Ostenberg, with other claims designated "worthless." In December, 1908, one Poole submitted to the receiver a bid for the assets of the bank, which had not been collected or disposed of. This bid was approved by the court, and an order entered to the effect that upon compliance with its terms the receiver assign and deliver to Poole the property of the bank included in his bid, which embraced accounts receivable. The order approving the bid recites, in substance, that it is for the best interest of the creditors of the bank that the bid be accepted. The receiver had not made any settlement with Ostenberg for the items upon which this action is based, neither did he make any demand upon him therefor. Poole assigned his bid to plain-

tiff, The United Securities Company. Later the receiver executed and delivered to the plaintiff a bill of sale in which he transferred all accounts, judgments, and claims belonging to or accruing to the bank, of every description, which had come into his hands, or which he was entitled to as receiver, not actually delivered or otherwise conveyed. The statute under which the sale was made by the receiver, Revised Statutes, 1908, Section 324, provides, *inter alia*: "That the receiver.........under the direction of the court, shall take possession of the books, records, and assets of every description, collect all debts, dues or claims, and sell or compound all doubtful debts, and sell all real and personal property, on such terms as the court shall direct, ........" The proceedings relative to the sale appear to be regular. It appears from the testimony that no demand was ever made by the bank on Ostenberg to reimburse it for the items represented by the drafts, cashier's check, and overdraft.

Section 862, Revised Statutes, 1908, inhibits a banking corporation from purchasing its own stock, or to use any of its funds for that purpose with certain exceptions, none of which are material. The learned trial judge found as a fact that the stock was sold to Chapman and Eldredge.

GABBERT, C. J., delivered the opinion of the court.

Accepting as correct the findings of the trial court that the stock was sold to Chapman and Eldredge the defendant cannot escape liability. The purchase was made with the funds and assets of the bank. The defendant knew this, and having received its funds and assets with this knowledge, he is liable therefor to its creditors. *DeBaca v. Higgins,* 58 Colo. 75, 143 Pac. 833. As a fact, however, the sale was made to the bank. At least the transaction must be so treated, because it is clear the purchase was not made by any individual. The statute inhibited the bank from making the purchase. The funds and assets of the bank were used to make the purchase with the knowledge of the defendant.

As a rule, to which there are few, if any exceptions, a stockholder who conveys his stock in a bank, to it, or for a transfer of his stock knowingly receives therefor the funds and assets of the bank, holds the same subject to the prior rights of the creditors of the institution.—*Crandall v. Lincoln,* 52 Conn. 73, 52 Am. Rep. 560; *DeBaca v. Higgins, supra.*

Whether or not the stock belonged to Ostenberg or his wife is not material. He was the cashier of the bank. True, he states that he handed in his resignation before the sale was agreed upon or the transfer was made, but it had not been accepted. This was a mere subterfuge resorted to for the purpose of apparently changing his relations with the bank. He still assumed to have control and authority over its affairs by entering the transaction upon the books of the bank, and in the circumstances of this case he must be treated as the cashier of the institution, not only at the time the arrangement for the sale of the stock was made, but also when the transaction was closed and he is therefore liable for the misappropriation of the assets of the bank to which he was a party in his official capacity independent of the ownership of the stock transferred.

The next question to consider is whether it can be said the transaction was ratified so as to estop the receiver, or his assignee, the plaintiff, from maintaining an action to recover the funds and assets received by Ostenberg in consideration of a transfer of the stock. Chapman, Freeman and Eldridge constituted a majority of the board of directors after Ostenberg retired. There is no testimony tending to prove that they attempted to ratify the application of the funds and assets of the bank for the purchase of the stock either by Chapman or Eldridge, or by the bank, or for its transfer, except their silence or failure to demand from Ostenberg that he repay the bank. They were members of the board authorizing the illegal transaction and could not ratify it as against creditors. *Oliver v. Rahway Ice Co.,* 64

N. J. Eq. 596, 54 Atl. 460. Neither does the silence of the stockholders of the bank, other than the directors above named, constitute a ratification. There is no testimony that they had any knowledge of the misappropriation of the funds and assets of the bank. *Oliver v. Rahway Ice Co., supra.*

The final question relates to the title of plaintiff to the causes of action sued upon and its right to maintain an action thereon. The bank could have maintained an action to recover on these items. So could the receiver for the benefit of the creditors of the institution. Under the law providing for the appointment of a receiver for an insolvent bank, and by the order of the court appointing him, the title to all the assets of the bank vested in him. The law authorizes the receiver to sell or compound all doubtful debts, and sell the personal property of the bank on such terms as the court may direct. This embraces indebtedness from persons which the creditors of the bank have a right to subject to the payment of their claims. The proceedings relating to the sale of the assets of the bank were regular, and were approved by the court. The indebtedness of Ostenberg sued upon was part of these assets. It was scheduled by the receiver, and though not specifically mentioned, unqestionably passed to the plaintiff by virtue of the sale by the receiver. The bid for the assets was approved, because it appeared it was for the best interest of the creditors and depositors that it be accepted, and we must assume that the sale was authorized, so that funds would be realized to apply upon their claims. The overdraft of Ostenberg was a debt due the bank. The money he received on the drafts and cashier's check created the relation of debtor and creditor between the bank and himself. These several items were, therefore, assignable, and plaintiff may maintain an action thereon. *Byxbie v. Wood,* 24 N. Y. 607; *Harrington v. Conner,* 51 Nebr. 214, 70 N. W. 911; sec. 7258 Revised Statutes 1908; *Home Insurance*

*Co., v. A. T. & S. F. R. Co.,* 19 Colo. 46. 34 Pac. 281. In other words, the items upon which plaintiff's causes of action are based are choses in action, and could, therefore, be assigned and an action maintained thereon by the assignee.

The judgment of the District Court is reversed and the cause remanded with directions to enter judgment in favor of the plaintiff and against the defendant in accordance with the views herein expressed.

*Judgment reversed and cause remanded with directions.*

Mr. JUSTICE GARRIGUES and Mr. JUSTICE SCOTT concur.